Filed 12/31/15

# IN THE SUPREME COURT OF CALIFORNIA

THE GILLETTE COMPANY et al., )
)
    Plaintiffs and Appellants, )
) S206587
    v. )
) Ct.App. 1/4 A130803
FRANCHISE TAX BOARD, )
) San Francisco County
    Defendant and Respondent. ) Super. Ct. No. CGC-10-495911
    [And five other cases.*] )
)
)
_____)

Here we consider how California calculates income taxes on multistate businesses. In 1974, California joined the Multistate Tax Compact (Multistate Tax Com., Model Multistate Tax Compact (Aug. 4, 1967)) (Compact), which contained an apportionment formula and permitted a taxpayer election between the Compact's formula and any other formula provided by state law. (Former Rev. & Tax. Code, § 38001 et seq., enacted by Stats. 1974, ch. 93, § 3, p. 193 and repealed by Stats. 2012, ch. 37, § 3.) The Legislature later amended the Revenue

---

\*     *The Proctor & Gamble Manufacturing Co. v. Franchise Tax Bd.* (No. CGC-10-495912); *Kimberly-Clark Worldwide, Inc. v. Franchise Tax Bd.* (No. CGC-10-495916); *Sigma-Aldrich, Inc. v. Franchise Tax Bd.* (No. CGC-10-496437); *RB Holdings (USA) Inc. v. Franchise Tax Bd.* (No. CGC-10-496438); *Jones Apparel Group, Inc. v. Franchise Tax Bd.* (No. CGC-10-499083).

and Taxation Code to specify a different apportionment formula that "shall" apply "[n]otwithstanding" the Compact's provisions. (Rev. & Tax. Code,[1] § 25128, subd. (a) (section 25128(a)).) Taxpayers here contend they remain entitled to elect between the new statutory formula and that contained in the Compact. We conclude the Legislature may properly preclude a taxpayer from relying on the Compact's election provision.

## I.  BACKGROUND

### A.  Apportionment of Business Income in California Before the Compact

When a business earns income in multiple jurisdictions, apportionment is necessary to avoid tax duplication or other inequity. The Uniform Law Commission, also known as the National Conference of Commissioners on Uniform State Laws, is "a non-profit association of lawyers who draft model legislation regarding areas of law in which they believe it would be best to have uniformity of law among the states." (*Metso Minerals Industries v. FLSmidth-Excel LLC* (E.D. Wis. 2010) 733 F.Supp.2d 969, 973, fn. 5.) In 1957, this commission drafted the Uniform Division of Income for Tax Purposes Act (7A pt. 1 West's U. Laws Ann. (2002) U. Div. of Income for Tax Purposes Act, § 1 et seq., p. 141) (the UDITPA or the Act). The Act was intended to provide a uniform guide for state laws and practices regarding multistate business taxation and to prevent taxation in multiple jurisdictions based "on more than [a business's] net income." (7A pt. 1 West's U. Laws Ann., *supra*, prefatory note, p. 142; see *ASARCO Inc. v. Idaho State Tax Comm'n* (1982) 458 U.S. 307, 310, fn. 3.) Our Legislature codified the provisions of the UDITPA in 1966. (See § 25120 et seq.)

---

[1]      Subsequent statutory references are to the Revenue and Taxation Code unless noted.

2

The statutory scheme included an apportionment formula based on three factors: (1) The value of real property the business held in California (the property factor); (2) compensation paid to California employees (the payroll factor); and (3) gross California sales (the sales factor). Each factor was divided by the worldwide property holdings, payroll, and sales of the business. (§§ 25129, 25132, 25134.) Those three factors were added, then divided by three, yielding a California apportionment figure. (Former § 25128, as added by Stats. 1966, ch. 2, § 7, p. 179.) Under this approach, each constituent factor was given equal weight in calculating the ultimate apportionment figure. That figure was then multiplied by the business's worldwide income to determine its California income tax liability.[2] (§ 25101.)

### B.  Promulgation of the Compact and its Adoption in California

The UDITPA was not widely adopted. States had scant motive to enact a uniform apportionment scheme benefitting multistate corporations. (See Ryan, *Beyond BATSA:  Getting Serious About State Corporate Tax Reform* (2010) 67 Wash. & Lee L.Rev. 275, 314, fn. 216 (Ryan); Swain, *Reforming the State Corporate Income Tax:  A Market State Approach to the Sourcing of Service Receipts* (2008) 83 Tul. L.Rev. 285, 295; see also 61C West's Ann. Rev. & Tax. Code (2004 ed.) p. 456 [UDITPA adoption table].)  The incentive arose with the specter of federal intervention. The United States Supreme Court held in

---

[2]     For example, if a taxpayer had 40 percent of its property in California, paid 30 percent of its payroll to California employees, generated 20 percent of its gross receipts from California sales, and had $10 million of worldwide business income, the taxpayer would:  (1) Calculate its apportionment factor by adding the property factor (40%), the payroll factor (30%), and the sales factor (20%), and dividing by three (90% divided by three equals 30%); then (2) calculate its taxable income by multiplying the apportionment factor (30%) by its total business income ($10 million) to arrive at a total taxable California income of $3 million.

3

*Northwestern States Portland Cement Co. v. Minnesota* (1959) 358 U.S. 450, that a state income tax could be levied on an out-of-state corporation based upon its in-state activities. "[T]he entire net income of a corporation, generated by interstate as well as intrastate activities, may be fairly apportioned among the States for tax purposes by formulas utilizing in-state aspects of interstate affairs." (*Id*. at p. 460.) This decision "prompted Congress to enact a statute . . . which sets forth certain minimum standards for the exercise of that power."[3] (*U.S. Steel Corp. v. Multistate Tax Comm'n* (1978) 434 U.S. 452, 455, fn. omitted (*U.S. Steel*).) Congress also authorized a study to recommend legislation regulating state taxation of interstate business income. (*Ibid*.)

That study, known as the "Willis Report," "recommended a uniform two-factor apportionment formula based on the amount of property and payroll in each state, as well as a blanket nexus standard that limited income tax jurisdiction to states in which a business had either real property or payroll." (Ryan, *supra,* 67 Wash. & Lee L.Rev. at pp. 311-312, fns. omitted; see Judiciary Special Subcom. on State Taxation of Interstate Commerce, H.R.Rep. No. 89-952, 1st Sess., pp. 1135-1136 (1965).) Starting in 1965, several congressional bills proposed a comprehensive tax scheme for interstate business income. (*U.S. Steel, supra,* 434 U.S. at p. 456, fn. 4.) Most states objected to the loss of sovereignty inherent in the Willis Report recommendations. Some states also feared the proposals would cause lost revenue. (See McLure, Jr., *The Difficulty of Getting Serious About State Corporate Tax Reform* (2010) 67 Wash. & Lee L.Rev. 327, 337.)

---

**3**      The statute prohibits states from imposing an income tax where the only activity in the state is the solicitation of sales fulfilled outside the state. (See 15 U.S.C. § 381(a).)

4

The Willis Report and subsequent congressional action spurred an "unprecedented special meeting of the National Association of Tax Administrators" in January 1966, at which "the idea of a multistate tax compact was envisioned." (Multistate Tax Com., First Annual Rep., Period Ending Dec. 31, 1968, p. 1.) A draft of the Compact was presented to the states in January 1967. It provided an alternative to potential federal legislation restricting state taxation power. Nine states adopted it within six months. (*Id*. at p. 2.)

The Compact includes two central features. The first is the creation of the Multistate Tax Commission (Commission). The Commission is empowered to: (1) study state and local tax systems; (2) recommend proposals to increase uniformity or compatibility of state and local tax laws, thus improving tax law and administration; (3) compile and publish information to assist the implementation of the Compact; and (4) do anything "necessary and incidental to the administration of its functions pursuant to this compact." (Compact, art. VI, § 3.) While the Commission may adopt uniform regulations interpreting the tax laws of its member states, these regulations are not binding. (Compact, art. VII; *U.S. Steel, supra,* 434 U.S. at p. 457.) The Compact also empowers a member state to ask the Commission to conduct audits, but only if the state has enacted enabling legislation. (Compact, art. VIII.)

The second central feature is the adoption of the UDITPA's equal-weighted apportionment formula. (Compact, art. IV.) The formula is designed to address the lack of uniformity among the various states' apportionment schemes. (Com., Third Annual Rep. (Fiscal Year July 1, 1969-June 30, 1970) p. 2.) The Compact contains an election provision. A taxpayer subject to apportionment of income "in two or more party States may elect to apportion and allocate his income in the manner provided by the laws of such State . . . ." (Compact, art. III, § 1.)

5

Alternatively, the taxpayer may elect to rely on the Compact's apportionment formula.  (*Ibid.*)

In 1974, the Legislature passed former section 38006, which included the entire text of the Compact, and made California a member state.  (Stats. 1974, ch. 93, § 3, p. 193.)  This action resulted in no immediate apportionment change because, as noted, existing California law had previously adopted the UDITPA formula.[4]

## C.  Change in the Apportionment Formula:  Amendment of Section 25128

This situation changed in 1993 when the Legislature adopted a different apportionment formula.  It amended section 25128(a) to provide: "*Notwithstanding Section 38006* [i.e., the provisions of the Compact], *all* business income *shall* be apportioned to this state by multiplying the business income by a fraction, the numerator of which is the property factor plus the payroll factor plus *twice* the sales factor, and the denominator of which is *four . . . .*"[5]  (§ 25128(a), as amended by Stats. 1993, ch. 946, § 1, p. 5441, italics added.)  Under this new formula, in-state sales were double-counted.  Those sales, then, amounted to half the calculation rather than the one-third used under the UDITPA approach.  The 1993 legislation did not withdraw California as a member state or otherwise

---

[4]    In 2015, the Commission passed a resolution modifying article IV of the model Compact to delete the UDITPA formula and to allow the adopting member state to replace it with any state apportionment formula.  (See Model Compact, art. IV, § 9, as revised by the Multistate Tax Com. on July 29, 2015, available online at <http://www.mtc.gov/getattachment/Uniformity/Article-IV/Model-Compact-Article-IV-UDITPA-2015.pdf.aspx> [as of Dec. 31, 2015].)

[5]    Section 25128 has subsequently been amended in ways not pertinent here. (See Stats. 1994, ch. 861, § 15, pp. 4269-4271; Stats. 1996, ch. 952, § 52, pp. 5447-5449; Stats. 1997, ch. 605, § 108, pp. 4025-4027.)

modify the Compact's election provision or apportionment formula set out in former article III, section 38006.  (Compact, art. III, § 1, art. IV.)

### D.  The Current Litigation

Between 1993 and 2005, six multistate corporations (Taxpayers) paid income tax calculated under the new formula.  They then sought a refund, arguing that the Compact gave them the right to choose between the new legislative formula or the UDITPA approach.  They claimed that under the UDITPA formula, they had overpaid their income tax by approximately $34 million.  After the Franchise Tax Board (FTB) denied their claims, they filed a refund action.  The trial court sustained the FTB's demurrer, concluding the Legislature could, consistent with the Compact, eliminate the election provision.  The Court of Appeal reversed, reasoning in part that the Legislature could not unilaterally repudiate mandatory terms of the Compact, which permitted election.[6]  We granted the FTB's petition for review.

## II.  DISCUSSION

The FTB contends section 25128(a)'s new apportionment formula should control, arguing that when member states entered the Compact their intent "was to allow them to change their state laws to establish alternate mandatory apportionment formulas."  Taxpayers do not dispute that the Legislature has authority to enact an alternate formula.  They argue instead that the Compact

---

**6**     In the wake of the Court of Appeal's decision, the Legislature passed a bill repealing the Compact.  (Stats. 2012, ch. 37, § 3.)  An uncodified portion of the bill also provided that "an election affecting the computation of tax must be made on an original timely filed return for the taxable period for which the election is to apply and once made is binding," and this doctrine is declaratory of existing law. (Stats. 2012, ch. 37, § 4, subds. (a), (c).)  This case does not involve application of that subsequent legislative action.

explicitly permits election and the Legislature is bound to allow it. This case turns on whether the Legislature is so bound. We conclude it is not and California's statutory formula governs.

### A. The Compact Constitutes State Law

Taxpayers recognize that the Compact does not have the force of federal law. It was never ratified by Congress as required under the compact clause. (See U.S. Const., art. I, § 10, cl. 3.) Even so, the United States Supreme Court held in *U.S. Steel* that states could enter into an agreement with each other without such ratification so long as the agreement was not " 'directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.' " (*U.S. Steel, supra,* 434 U.S. at p. 468, quoting *Virginia v. Tennessee* (1893) 148 U.S. 503, 519.) *U.S. Steel* concluded the Compact did not run afoul of the compact clause: "[T]he test is whether the Compact enhances state power *quoad* the National Government. This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission. Moreover, as noted above, each State is free to withdraw at any time." (*U.S. Steel*, at p. 473.)

The Legislature ordinarily has authority to repeal or modify any enactment. "[T]he legislative power the state Constitution vests is plenary," and "[a] corollary of the legislative power to make new laws is the power to abrogate existing ones. What the Legislature has enacted, it may repeal." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 254, 255; see Cal. Const., art. IV, § 1.) "We thus start from the premise that the Legislature possesses the full extent of the

8

legislative power and its enactments are authorized exercises of that power. Only where the state Constitution withdraws legislative power will we conclude an enactment is invalid for want of authority." (*Matosantos*, at p. 254.) Similarly, "the Legislature is supreme in the field of taxation, and the provisions on taxation in the state Constitution are a limitation on the power of the Legislature rather than a grant to it." (*Delaney v. Lowery* (1944) 25 Cal.2d 561, 568; see *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 247.)

Taxpayers acknowledge the lack of congressional approval but argue "interstate compacts (approved or not) take precedence over other state laws" because "they are both contracts and binding reciprocal statutes among sovereign states." Taxpayers thus contend section 25128 violates the contract clauses of the federal and state Constitutions because it impairs an obligation created by an interstate compact. (See U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) We need not decide whether an interstate compact not approved by Congress necessarily takes precedence over other state law. Instead, we evaluate whether this Compact is a binding contract among its members. We conclude it is not.

### B. The Compact is Not a Binding Reciprocal Agreement

The Commission, which was created by the Compact, has filed an amicus curiae brief here. In the Commission's own view, the Compact is not binding. "Rather, it is an advisory compact that contains two apportionment provisions, the UDITPA formula and the election provision . . . which are more in the nature of model uniform laws." To support this interpretation, the Commission urges a test derived from *Northeast Bancorp v. Board of Governors, FRS* (1985) 472 U.S. 159 (*Northeast Bancorp*). That case involved an attempt by several out-of-state banks to acquire banks in New England. Federal law prohibited the acquisition of local banks by out-of-state banks unless expressly authorized by state law. (See 12

9

U.S.C., former § 1842(d).) Some states passed laws permitting such acquisitions, but only if the home-state law contained a reciprocity provision allowing acquisitions by banks from the foreign state in question. Other states also allowed acquisitions only by banks from a particular geographic area. (*Northeast Bancorp*, at pp. 163-165.) The out-of-state banks claimed these state laws violated the compact clause because they failed to garner congressional approval. *Northeast Bancorp* expressed "doubt as to whether there is an agreement amounting to a compact." (*Id*. at p. 175.) The court reasoned "several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. Most importantly, neither statute requires a reciprocation of the regional limitation." (*Ibid*.) The Commission asserts the Compact does not satisfy any of the indicia of binding interstate compacts noted in *Northeast Bancorp*. We agree.[7]

### 1. *Reciprocal Obligations*

We begin with the "[m]ost important[]" factor: whether the Compact created reciprocal obligations among member states. (*Northeast Bancorp, supra,* 472 U.S. at p. 175.) The Commission argues the Compact creates no reciprocal

---

[7]    Taxpayers argue in passing that the *U.S. Steel* decision determined the Compact was a binding one, and "[i]f the Court had a doubt about whether the Compact was a binding interstate compact, it would have said so." The argument is unpersuasive. *U.S. Steel* concluded only that the compact clause did not require Congress to approve the Compact for it to be valid. (See *U.S. Steel, supra,* 434 U.S. at pp. 472-478.) The court had no occasion to decide whether the Compact constituted a binding agreement that could not be unilaterally amended by its members. Indeed, *U.S. Steel* predated *Northeast Bancorp*, wherein the high court first articulated the factors to consider in determining the binding nature of an interstate agreement.

obligations, especially with respect to maintaining the election provision. Like *Northeast Bancorp*, *U.S. Steel* emphasized the importance of reciprocity when determining whether a binding interstate compact exists. "[T]he mere form of the interstate agreement cannot be dispositive" of whether the compact clause applies. (*U.S. Steel, supra,* 434 U.S. at p. 470.) It went on to explain "[a]greements effected through reciprocal legislation may present opportunities for enhancement of state power at the expense of the federal supremacy similar to the threats inherent in a more formalized 'compact.' " (*Ibid*., fn. omitted.) Conversely, as *U.S. Steel* suggested, simply because an agreement is labeled a "compact" is not dispositive of whether it is binding unless it contains key features, such as reciprocity. (See *Northeast Bancorp, supra,* 472 U.S. at p. 175.)

Taxpayers admit that "party states do not perform or deliver obligations to one [another]" and "have no incentive to enforce the Compact," which "is not the type of contract where the parties exchange obligations and are in a meaningful position to gauge each other's compliance." Nevertheless, they argue the member states' commitment to the UDITPA formula is what prevented congressional intervention, and maintenance of that formula is mutual, reciprocal, and "critical to the effectiveness of the Compact."

As described *ante*, there is little doubt that, decades ago, the possibility of congressional action helped spur adoption of the Compact. But Taxpayers do not explain how a state's elimination of the UDITPA formula renders the Compact less "effective." More importantly, whether it does or not is a completely different question from whether the Compact constitutes a reciprocal obligation among members. The Compact's provision of election between the UDITPA or any other state formula does not create an obligation of member states *to each other*. Even if maintenance of the election provision in one member state might benefit taxpayers in another state, that benefit to the taxpayer applies whether the taxpayer

11

is from a member or nonmember state. This application is more akin to the adoption of a model law rather than the creation of any mutual obligations among Compact members. We note the Commission, in its amicus curiae brief, does not urge that California's decision to discontinue use of the UDITPA formula in any way undermines the effectiveness of the Compact.

Indeed, as noted, the UDITPA was promulgated as a model law, and our Legislature adopted it years before joining the Compact. Clearly, the Legislature is free to amend its own legislation even if it is based on a model law. (See *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 772 [noting the Legislature was "free" to amend the UDITPA].) Nothing in the language of the Compact, nor California's enactment of it, suggested any change in the Legislature's authority to modify the apportionment formula. The Legislative Counsel commented that the Compact did not "alter any state tax." (Ops. Cal. Legis. Counsel, No. 11600 (May 27, 1973) Multistate Tax Compact (Assem. Bill No. 1304) (1973-1974 Reg. Sess.) 5 Sen. J. (1973-1974 Reg. Sess.) p. 8250.)

### 2. *Conditional or Unilateral Action*

Other indicia of a binding compact include whether its effectiveness depends on the conduct of other members and whether any provision prohibits unilateral member action. With respect to the former, the Compact has not required efficacious member action since 1967. By its terms, the Compact became effective once it had been "enacted into law by any seven States." (Compact, art. X, § 1.) Nine states other than California enacted the Compact within six months of its initial draft. (Com., First Annual Rep., *supra*, at p. 2.) Thereafter, the Compact was effective "as to any other State upon its enactment thereof." (Compact, art. X, § 1.) Thus, the Compact had long been effective when

12

California joined it in 1974. No action by existing members was required to admit California.

Any state may join the Compact simply by enacting its provisions into law. As *U.S. Steel* observed, "each State is free to withdraw at any time." (*U.S. Steel, supra,* 434 U.S. at p. 473; see Compact, art. X, § 2.) Thus, any state may join or leave the Compact without notice. This ability of member states to unilaterally come and go as they please militates against a finding that the Compact is a binding interstate agreement under *Northeast Bancorp*. (See *Seattle Master Builders v. Pacific Northwest Elec. Power* (9th Cir. 1986) 786 F.2d 1359, 1372 (*Seattle Master Builders*).)

Contrary to the Taxpayers' arguments, the presence of a withdrawal provision says nothing about a member state's ability to unilaterally modify the Compact. Indeed, no express language of the Compact or any California enabling statute proscribes unilateral amendment of our own state law. As the FTB observes, the history of the Compact is replete with examples of unilateral state action. Florida was one of the first states to enact the Compact in 1967. Yet it later passed statutes eliminating Compact articles III and IV from Florida law. The Commission subsequently resolved that, in spite of that action, Florida was recognized "as a regular member in good standing of the Multistate Tax Compact and the Multistate Tax Commission." (Com., Minutes of Meeting, Dec. 1, 1972, p. 2.) Numerous member states have subsequently enacted different apportionment formulae. Currently, only seven of the Compact's 16 members employ the equal-weighted UDITPA formula.[8]

---

[8] Those states are Alaska, Hawaii, Kansas, Missouri, Montana, New Mexico, and North Dakota. (See Federation of Tax Administrators, chart, State Apportionment of Corporate Income, available online at

*(footnote continued on next page)*

13

Member state adoption of different formulae, coupled with the Compact's express grant of authority to join or leave the Compact at will, confirms that the Compact did not prohibit unilateral state action. The freedom of members to engage in such unilateral conduct is inconsistent with the type of binding agreement contemplated by *Northeast Bancorp*.

### 3. Regulatory Organization

The Taxpayers argue that the establishment of the Commission is "a classic characteristic of an interstate compact." The argument ignores an important point. Although the Compact established the Commission, that body has no authority ordinarily associated with a *regulatory* organization. Article VI of the Compact authorizes the Commission to "[s]*tudy* State and local tax systems and particularly types of State and local taxes," "[d]evelop and *recommend* proposals for an increase in uniformity or compatibility of State and local tax laws with a view toward *encouraging* the simplification and improvement of State and local tax law and administration," and "[c]ompile and publish such information as would, in its judgment, *assist* the party States in implementation of the compact and taxpayers in complying with State and local tax laws." (Compact, art. VI, § 3, subds. (a)-(c), italics added.) As the Commission observes, these powers "are strictly limited to an advisory and informational role."

The Commission may also promulgate administrative regulations "in the event that two or more States have uniform provisions relating to specified types of taxes." (*U.S. Steel, supra,* 434 U.S. at p. 457; see Compact, art. VII.) However,

_____

*(footnote continued from previous page)*

<http://www.taxadmin.org/assets/docs/Research/Rates/apport.pdf> [as of Dec. 31, 2015].)

14

as *U.S. Steel* observed: "These regulations are advisory only. Each member State has the power to reject, disregard, amend, or modify any rules or regulations promulgated by the Commission. They have no force in any member State until adopted by that State in accordance with its own law." (*U.S. Steel*, at p. 457.) While these regulations may play a *persuasive* role in shaping policy, the Commission's inability to bind member states to adopt them further confirms it is not a regulatory organization within the meaning of *Northeast Bancorp*.

Similarly, the Commission may conduct taxpayer audits but only if the member state has passed separate authorizing legislation and expressly requests the audit. (Compact, art. VIII.) In such a case, the Commission acts as "the State's auditing agent" and any power of compulsory process derives from the authority vested by the laws of the requesting member state. (*U.S. Steel, supra,* 434 U.S. at p. 457; Compact, art. VIII, § 4.) Further, although the Commission may "require the attendance of persons and the production of documents in connection with its audits," it "has no power to punish failures to comply" and "must resort to the courts for compulsory process, as would any auditing agent employed by the individual States." (*U.S. Steel*, at p. 475; Compact, art. VIII, §§ 3-4.)

Finally, the Compact authorizes the Commission to provide for binding arbitration of disputes between member states. (Compact, art. IX, § 1.) However, the Commission has never adopted such a regulation and no arbitration provisions are currently effective. (See *U.S. Steel, supra,* 434 U.S. at p. 457, fn. 6.) Indeed, California hesitated to join the Compact due, in part, to concerns that such an arbitration provision would not only displace California institutions as the forum for tax disputes, but that "easy access to arbitration" would lead to "erosion of the state's tax base." (Assem. Com. on Rev. & Tax., analysis of Assem. Bill No. 1304 (1973-1974 Reg. Sess.) as amended June 14, 1973, p. 3.) The Legislature

15

approved California's membership upon explicit condition that the Commission *not* make the arbitration provision effective. An uncodified portion of our enacting statute provided that California would automatically withdraw from the Compact if the Commission changed its voting rules or if the arbitration provision was made effective. (Stats. 1974, ch. 93, § 5, p. 208.)[9]

As discussed, *U.S. Steel* held the Compact did not encroach on federal authority in any way that would require congressional approval under the compact clause. The *U.S. Steel* court observed there is no "delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission." (*U.S. Steel, supra,* 434 U.S. at p. 473.) The Commission simply has no binding regulatory authority upon member states. Whatever power the Commission has to promulgate regulations or conduct audits exists solely at the pleasure of each member state. Further, the only express powers of the Commission *independent* of authority granted by each member is

---

[9]     Section 5 of the enacting statute provided: "This act is hereby repealed and shall have no further force or effect, and this state is withdrawn from the Multistate Tax Compact as set forth in Section 38006 of the Revenue and Taxation Code, on the 10th day after the occurrence of any of the following events after the operative date of this act: [¶] (1) The Multistate Tax Commission adopts any regulation placing in effect Article IX of the Multistate Tax Compact, or any part thereof, as set forth in Section 38006 of the Revenue and Taxation Code, or [¶] (2) The Multistate Tax Commission places in effect any bylaw or regulation or parliamentary ruling for the conduct of its business which permits any matter voted upon to be adopted other than by receiving a majority of the number of member states and a majority of the total population of all the member states according to the current United States Statistical Abstract, or [¶] (3) The entry of a final judgment by any court of competent jurisdiction requiring the Multistate Tax Commission to place in effect Article IX of the Multistate Tax Compact as set forth in Section 38006 of the Revenue and Taxation Code, or requiring or approving any matter to be adopted by the Multistate Tax Commission by the employment of a different manner of voting than that set forth in subparagraph (2) of this section." (Stats. 1974, ch. 93, § 5, p. 208.)

purely advisory. It may study tax laws, make proposals, and publish data. (Compact, art. VI, § 3.) Because the Commission lacks any binding authority over the member states, it is not a joint regulatory organization as contemplated by *Northeast Bancorp*. (*Northeast Bancorp, supra,* 472 U.S. at p. 175.)**10**

Nothing in the language of former section 38006, the circumstances of its enactment, the subsequent conduct of other members states, or the position taken by the Commission, indicate our Legislature intended to be bound by the taxpayer election provision.

## C. The Reenactment Rule Does Not Bar the Legislature's Amendment of Section 25128

Taxpayers alternatively argue that the Legislature's amendment of section 25128 is invalid because it violates the reenactment rule. That rule derives from article IV, section 9 of our Constitution, stating: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void. A statute may not be amended by reference to its title. *A section of a statute may not be amended unless the section is re-enacted as amended*." (Italics added.) One purpose of this provision "is to 'make sure legislators are not operating in the blind when they amend legislation, and to make sure the public can become apprised of changes in the law.' " (*St. John's Well Child and Family Center v. Schwarzenegger* (2010)

---

**10**     See also *In re Manuel P.* (1989) 215 Cal.App.3d 48, 66-67 (statute regarding the deportation of minor wards did not create an interstate agreement within the meaning of *Northeast Bancorp*); compare with *Seattle Master Builders, supra,* 786 F.2d at p. 1363 (concluding the Pacific Northwest Electric Power and Conservation Planning Council constituted a compact agency within the meaning of *Northeast Bancorp*).

50 Cal.4th 960, 983, fn. 20; *Hellman v. Shoulters* (1896) 114 Cal. 136, 152 (*Hellman*).)

Generally, the reenactment rule does not apply to statutes that act to "amend" others only by implication. (*Hellman, supra,* 114 Cal. at p. 152.) We reasoned long ago in *Hellman*: "To say that every statute which thus affects the operation of another is therefore an amendment of it, would introduce into the law an element of uncertainty which no one can estimate. It is impossible for the wisest legislator to know in advance how every statute proposed would affect the operation of existing laws." (*Ibid.*) The Legislature's 1993 amendment of section 25128 replaced the equal-weighted UDITPA apportionment formula with a different formula double-counting the sales factor. This amendment expressly referenced the Compact, stating that it applied "[n]otwithstanding Section 38006 . . . ." (§ 25128(a) as amended by Stats. 1993, ch. 946, § 1, p. 5441.) Although Taxpayers note that the legislative bill *analyses* of the amendment did not refer to the Compact or the election provision expressly, reference to the Compact in section 25128(a) itself is strong evidence that the Legislature acted with the Compact in mind. "Even without a re-enactment, the legislators and the public have been reasonably notified of the changes in the law." (*White v. State of California* (2001) 88 Cal.App.4th 298, 315; see *Brosnahan v. Brown* (1982) 32 Cal.3d 236, 256-257.) So too here. Even without a reenactment of section 38006 to eliminate the election language, the amendment of section 25128 did not violate the reenactment rule.

### D.  The Legislature Intended to Supersede the Compact's Election Provision

Having concluded the Legislature had the unilateral *authority* to eliminate the Compact's election provision, we must determine whether it *intended* to do so.

Taxpayers suggest it did not, arguing that the Legislature intended section 25128's double-sales factor formula to apply only "if the Compact Formula is not elected."

Both the language of section 25128 and its legislative history defeat such a claim. First, section 25128(a) explicitly provides that "*all business income shall be apportioned* to this state by" using the formula it sets out, "[*n*]*otwithstanding Section 38006* [i.e., the Compact] . . . ." (Italics added.) There is no ambiguity in this language. The Assembly Committee on Revenue and Taxation's analysis of the bill explained the need for the amendment: "California and most other states have used an equal weighted three-factor apportionment formula for many years. This formula has been retained largely out of a belief that uniformity among states is the best way to ensure that corporations are not subject to double taxation or that some income 'falls through the crack'. While any apportionment formula may be somewhat arbitrary, supporters of the current system argue that it is still in California's best interest to remain uniform with other states. [¶] However, while uniformity in apportionment methods existed between states in the 1960's and may still be a desirable principle, this uniformity has been eroded significantly in recent years by the actions of other states. Currently twenty-five other states at least provide an option to certain taxpayers to place an additional weight on the sales factor in their apportionment formulas . . . . [¶] Proponents believe that California's continued reliance upon the three-factor apportionment system results in discriminatory taxation against California-based companies, particularly given the additional weight given to sales factors by other states." (Assem. Com. on Rev. & Tax., analysis of Sen. Bill No. 1176 (1993-1994 Reg. Sess.) as introduced Mar. 5, 1993, pp. 2-3; see also Sen. Com. on Rev. & Tax., analysis of Sen. Bill No. 1176 (1993-1994 Reg. Sess.) as introduced Mar. 5, 1993, p. 2.) In light of the statute's language and this legislative history, there is no credible argument that the Legislature intended to retain the Compact's election provision.

## III. DISPOSITION

The Court of Appeal's judgment is reversed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**MURRAY, J.** *

_____

\*     Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** The Gillette Company v. Franchise Tax Board
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 209 Cal.App.4th 938
**Rehearing Granted**

_____

**Opinion No.** S206587
**Date Filed:** December 31, 2015

_____

**Court:** Superior
**County:** San Francisco
**Judge:** Richard A. Kramer

_____

**Counsel:**

Silverstein & Pomerantz, Amy L. Silverstein, Edwin P. Antolin, Johanna W. Roberts, Charles E. Olson and Lindsay T. Braunig for Plaintiffs and Appellants.

Jeffrey B. Litwak; BraunHagey & Borden and Matthew Borden as Amici Curiae on behalf of Plaintiffs and Appellants.

Wm. Gregory Turner for Council on State Taxation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Keith G. Landry; Reed Smith, Brian W. Toman, Mardiros H. Dakessian, Muhammad I. Shaikh and Erin J. Mariano for Institute for Professionals in Taxation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Miriam Hiser, Miriam Hiser; Masters, Mullins & Arrington and Richard L. Masters for Interstate Commission for Juveniles and Association of Compact Administrators of the Interstate Compact on the Placement of Children as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Susan Duncan Lee, Acting State Solicitor General, Edward C. DuMont, State Solicitor General, Kathleen A. Kenealy, Chief Assistant Attorney General, Paul D. Gifford, Assistant Attorney General, W. Dean Freeman, Joyce E. Hee and Lucy F. Wang, Deputy Attorneys General, for Defendant and Respondent.

**Page 2 – S206587 – counsel continued**

**Counsel:**

Gregg Abbot, Attorney General (Texas), Mark L. Walters and Daniel T. Hodge, Assistant Attorneys General, Jonathan F. Mitchell, Solicitor General, Rance Craft, Assistant Solicitor General; Luther Strange, Attorney General (Alabama); Michael C. Geraghty, Attorney General (Alaska); Dustin McDaniel, Attorney General (Arkansas); John W. Suthers, Attorney General (Colorado); Irvin B. Nathan, Attorney General (District of Columbia); David M. Louie, Attorney General (Hawaii); Lawrence G. Wasden, Attorney General (Idaho); Derek Schmidt, Attorney General (Kansas); Bill Schuette, Attorney General (Michigan); Lori Swanson, Attorney General (Minnesota); Chris Koster, Attorney General (Missouri), Timothy C. Fox, Attorney General (Montana); Catherine Cortez Masto, Attorney General (Nevada); Gary K. King, Attorney General (New Mexico); Wayne Stenehjem, Attorney General (North Dakota); Ellen F. Rosenblum, Attorney General (Oregon); John E. Swallow, Attorney General (Utah); and Robert W. Ferguson, Attorney General (Washington) as Amici Curiae on behalf of the states of Texas, Alabama, Alaska, Arkansas, Colorado, Hawaii, Idaho, Kansas, Michigan, Minnesota, Missouri, Montana, Nevada, New Mexico, North Dakota, Oregon, Utah, Washington and the District of Columbia.

Joe Huddleston, Shirley K. Sicilian and Sheldon H. Laskin for Multistate Tax Commission as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Amy L. Silverstein
Silverstein & Pomerantz
12 Gough Street, 2nd Floor
San Francisco, CA  94103
(415) 593-3500

Edward C. DuMont
State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5202