KISTLER, J.
**703 In 1967, Oregon enacted the Multistate Tax Compact (MTC) to promote the uniform apportionment of income earned by multistate businesses. Or. Laws 1967, ch. 242, § 1 (stating the purposes of the act). That statute, which was codified as ORS 305.655, set out formulas that multistate businesses could use to determine the portion of their income that was subject to taxation in Oregon.[1] In 1993, the Oregon legislature provided that businesses could not use the apportionment formulas set out in ORS 305.655 to the extent that those formulas differed from apportionment formulas set out in another set of Oregon statutes. Or. Laws 1993, ch. 726, § 20.
In 2010 and 2011, Health Net, Inc., and its subsidiaries (collectively "taxpayer") sought a refund for tax years 2005 to 2007, claiming that ORS 305.655 had created contractual obligations, which the 1993 law impaired in violation of the state and federal contract clauses. The Tax Court rejected that claim, holding that ORS 305.655 created only statutory rights, which the legislature was free to modify. In doing so, the Tax Court aligned Oregon with all the state courts that have addressed this issue. We now affirm the Tax Court's judgment.
*1036 This case presents primarily two issues. The first is whether, in enacting ORS 305.655, the 1967 legislature went beyond enacting a statute intended to promote the uniform taxation of multistate businesses and instead entered into a binding contract, which the 1993 law impaired in violation of the state and federal contract clauses. The second is whether the 1993 legislation impliedly repealing part of ORS 305.655 violated Article IV, section 22, of the Oregon Constitution by not setting out the text of that statute. Before addressing those issues, we first describe briefly the background that underlies taxpayer's claims.
**704 I. BACKGROUND
A. National developments
In 1957, the National Conference of Commissioners on Uniform State Laws promulgated a uniform act-the Uniform Distribution of Income for Tax Purposes Act (UDITPA)-to provide a fair way to apportion income earned by multistate businesses among the various states. Arthur D. Lynn, Jr., The Uniform Division of Income for Tax Purposes Act , 19 Ohio St. L.J. 41 (1958). UDITPA divides income into two categories: business and nonbusiness income. Id. at 43. It provides different formulas for apportioning each category of income. Id. at 46. Of relevance here, UDITPA provides that all business income shall be apportioned using an equally weighted average of three ratios, which reflect a business's property, payroll, and sales within and without a state. See Atlantic Richfield Co. v. Dept. of Rev. , 300 Or. 637, 639-40, 717 P.2d 613, adh'd to on recons. , 301 Or. 242, 722 P.2d 727 (1986) (illustrating application of the three-factor formula). Additionally, UDITPA specifies how sales of tangible property and other types of sales should be allocated to states to determine the percentage of a multistate business's income that each state may tax. See Powerex Corp. v. Dept. of Rev. , 357 Or. 40, 60, 346 P.3d 476 (2015) (discussing allocation principles for sales of tangible property).
In 1959, two years after the National Conference of Commissioners on Uniform State Laws promulgated UDITPA, the United States Supreme Court confirmed that states constitutionally may tax income derived exclusively from interstate commerce. Northwestern Cement Co. v. Minnesota , 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed. 2d 421 (1959). Specifically, the Court held that the Commerce Clause did not prohibit Minnesota from taxing a foreign corporation's in-state sales, even though those sales were exclusively in furtherance of interstate commerce. Id. at 452, 464, 79 S.Ct. 357. Although the Court recognized that permitting Minnesota to tax those sales raised the possibility that two states could tax the same income, it observed that the petitioners had not challenged the formula Minnesota used to apportion the corporation's income among the states. Id. at 462-63, 79 S.Ct. 357. The Court accordingly found it unnecessary to decide whether **705 a different method of apportioning income from interstate sales would raise constitutional issues. Id.
The decision in Northwestern Cement Co. led to two related but separate congressional responses. First, six months after Northwestern Cement Co. was decided, Congress enacted a statute that precluded a state from taxing an out-of-state corporation's income when the corporation's only activity within the state was either soliciting sales or using an independent contractor to solicit those sales. James E. Sabine, Constitutional and Statutory Limits on the Power to Tax , 12 Hast. L.J. 23, 24-27 (1960) (summarizing federal legislation). Second, Congress appointed a commission to study whether further federal measures were necessary to avoid unduly burdensome taxation of multistate businesses. Id.
Among other things, the resulting study noted that there was a "widespread adoption of the three-factor property-payroll-sales formula" for apportioning income. State Taxation of Interstate Commerce: Report of the Special Subcommittee on State Taxation of Interstate Commerce , H.R. Rep. No. 88-1480, at 119 (1964). The study also noted, however, that there were variations in the way that sales were allocated to states, and Congress considered legislation that would have limited the states' authority to tax multistate business income. Id. ; see Frank M. Keesling and John S. Warren, California's *1037 Uniform Division of Income for Tax Purposes Act , 15 UCLA L. Rev. 156, 159-63 (1967) (discussing proposed federal legislation).
By 1967, 19 of the 38 states that taxed income earned by multistate businesses had adopted "most or all of [UDITPA's] provisions." Keesling & Warren, 15 UCLA L. Rev. at 158. To further promote the uniform taxation of business income and to ward off further federal intervention in state taxation, the Council of State Governments drafted the MTC in 1966 and circulated it among the states in early 1967. The MTC consists of 12 articles. Article IV incorporates the apportionment formulas set out in UDITPA. Article III permits a multistate business to elect either the apportionment formulas set out in Article IV or apportionment formulas set out elsewhere in a state's tax code to determine the portion **706 of the business's income that is subject to taxation in that state.
Article VI creates the Multistate Tax Commission, which is composed of representatives from member states and funded by donations and grants.[2] The commission may recommend rules to member states to advance the uniform application of state tax laws, but member states are free to accept or reject any rule the commission recommends. Art. VII.
Two other articles provide additional means for enhancing the uniform application of state tax laws. Article VIII permits a member state to ask the commission to audit a corporation's books, papers, and records, but "only in those party States that specifically provide therefor by statute." Art. VIII, § 1. Article IX provides for arbitration of a state agency's determination regarding apportionment or allocation if the commission adopts a regulation "placing this Article in effect." Art. IX, § 1. California enacted the MTC on the condition that Article IX not be placed in effect, and that article is not in effect. Gillette Co. v. Franchise Tax Bd. , 62 Cal. 4th 468, 482, 196 Cal.Rptr.3d 486, 363 P.3d 94 (2015), cert. den. , --- U.S. ----, 137 S. Ct. 294, 196 L.Ed.2d 238 (2016).
Finally, Article X provides that "[t]his compact shall enter into force when enacted into law by any seven States" and shall "become effective as to any other State upon its enactment thereof." Art. X, § 1. Article X also provides that "[a]ny party State may withdraw from this compact by enacting a statute repealing the same." Id. § 2.
B. Oregon legislation
In 1965, the Oregon legislature enacted UDITPA. Or. Laws 1965, ch. 152; see ORS 314.605 to 314.675 (codifying UDITPA). Two years later, Oregon enacted the MTC. Or. Laws 1967, ch. 242, § 1; see ORS 305.655 (codifying the **707 MTC). Because Article IV of the MTC incorporates UDITPA, those two Oregon statutes initially provided the same formulas for apportioning business income. Compare ORS 314.605 to 314.675 (1965) (Oregon's version of UDITPA), with Article IV of ORS 305.655 (incorporating the apportionment formulas from UDITPA).[3] Under Article III of ORS 305.655, a business could elect either set of apportionment formulas. However, because the formulas were the same, the ability to elect one or the other initially made no difference.
Beginning in 1989, the legislature enacted a series of amendments to the apportionment formulas in Oregon's version of UDITPA, which progressively increased the weight given the sales factor. See Or. Laws 1989, ch. 1088, § 1 (increasing the weight given the sales factor from 33.33 percent to 50 percent); Or. Laws 2001, ch. 793, § 1 (increasing the weight given the sales factor to 80 percent); Or. Laws 2003, ch. 739, § 1 (increasing the weight given the sales factor to 90 percent). In 2005, the legislature completed that progression by providing that only the sales factor would be used to determine the percentage *1038 of a multistate business's income that is taxable in Oregon. Or. Laws 2005, ch. 832, § 49.[4]
Although the legislature modified the apportionment formulas set out in Oregon's version of UDITPA, the apportionment formulas set out in Article IV of ORS 305.655 remained unchanged. At first, that difference had no practical effect on multistate businesses. Under Article III of ORS 305.655, a multistate business could elect to have its taxable Oregon income determined using either the formulas set out in Article IV of ORS 305.655 or the modified formulas set out in Oregon's version of UDITPA.
**708 In 1993, however, the legislature provided that, to the extent that Oregon's version of UDITPA conflicted with ORS 305.655, Oregon's version of UDITPA controlled. Or. Laws 1993, ch. 726, § 20; see Powerex , 357 Or. at 72, 346 P.3d 476 (applying that rule). As a result of the 1993 act, Oregon eliminated a multistate business's ability to elect the statutory apportionment formulas set out in Article IV of ORS 305.655 and required instead that the business use the modified apportionment formulas set out in Oregon's version of UDITPA.
C. Procedural background
Taxpayer is a multistate corporation that has been doing business in Oregon since at least 1989. In 2010, taxpayer filed refund claims with the Oregon Department of Revenue (the department) for the 2005 and 2006 tax years. In 2011, taxpayer filed a refund claim for the 2007 tax year. Taxpayer's refund claims rest on the following propositions: In enacting ORS 305.655 in 1967, the Oregon legislature entered into a contract with other states that enact the MTC.[5] Under the terms of the MTC, the legislature could not eliminate taxpayer's right granted by Article III to elect the apportionment formulas set out in Article IV unless Oregon withdrew from the contract pursuant to Article X, which Oregon had not done at that point. It followed, taxpayer concluded, that the department had breached the contractual obligations created by Article III when it failed to honor taxpayer's election. Taxpayer recognized that the Oregon legislature had altered those obligations in 1993. However, it contended that the 1993 act impaired its contract rights in violation of the state and federal contract clauses.[6]
**709 On cross-motions for summary judgment, the Tax Court granted the department's motion and denied taxpayer's. It did so for three reasons. The Tax Court concluded that: (1) even assuming that ORS 305.655 gave rise to contractual obligations, those contractual obligations were illusory because Oregon was free to withdraw from the MTC at any time; (2) the text and context of ORS 305.655 do not reflect an unambiguous intent to create contractual, as opposed to statutory, obligations; and (3) the course of conduct by other states that had enacted the MTC (subsequently overriding the election provisions of Article III) was further evidence that Article III of ORS 305.655 did not create contractual obligations. The Tax Court accordingly entered judgment in the department's favor.
II. ISSUES
This appeal presents essentially two issues. The first is whether the 1993 act eliminating *1039 a business's right under Article III of ORS 305.655 to elect the apportionment formulas in Article IV of that statute violates either the state or federal contract clauses. That issue turns initially on a subsidiary state-law question: whether, in enacting ORS 305.655, the 1967 legislature intended to impose contractual obligations on the state. See Hughes v. State of Oregon , 314 Or. 1, 14, 838 P.2d 1018 (1992) (in analyzing a contract clause claim, the initial question is whether a contract exists). While not dispositive of taxpayer's federal Contract Clause claim, the determination of that subsidiary state-law issue is a necessary predicate to its resolution. See General Motors Corp. v. Romein , 503 U.S. 181, 187, 112 S.Ct. 1105, 117 L.Ed. 2d 328 (1992) (in deciding federal Contract Clause questions, the Court gives "respectful consideration and great weight" to the state court's conclusion regarding the existence and terms of any contract). The second issue is whether the bill enacting the 1993 act failed to comply with Article IV, section 22, of the Oregon Constitution because it did not set out the text of ORS 305.655. We begin by considering whether ORS 305.655 created contractual obligations or only statutory ones.
III. ORS 305.655
Taxpayer argues that, when the Oregon legislature enacted ORS 305.655 in 1967, it entered into a contract **710 with other states that also enacted the MTC. Taxpayer bases that argument primarily on the use of the word "compact" in ORS 305.655, the conditions that Article X places on ORS 305.655 going into effect and on withdrawing from the compact, and the history that preceded the drafting of the MTC. The department responds that, in determining whether ORS 305.655 created contractual obligations rather than statutory ones, we should begin with the standard that this court customarily applies: before a statute will give rise to contractual obligations, the legislature's intent to do so must be clear and unmistakable. Additionally, the department argues that we should focus on how ORS 305.655 functions, not on the label that the legislature used. Applying those principles, the department reasons that ORS 305.655 is functionally no different from a uniform law, the enactment of which does not create contractual obligations. At a minimum, the department contends, the legislature's intent to create contractual obligations was ambiguous-a conclusion that, under this court's cases, defeats taxpayer's attempt to convert statutory rights into contractual ones.
Nationally, the proposition that underlies taxpayer's argument-that states that enact the MTC enter into a contract with each other-has given rise to two related but separate legal challenges. The first occurred five years after the MTC was drafted and circulated among the states. In 1972, corporations faced with an audit under Article VIII of the MTC argued that the MTC was an "Agreement or Compact" among the states within the meaning of the Compact Clause of the federal constitution and, as a result, was unenforceable because Congress had never approved it. See U.S. Steel Corp. v. Multistate Tax Comm'n , 434 U.S. 452, 458, 98 S.Ct. 799, 54 L.Ed. 2d 682 (1978) (describing the plaintiffs' argument).[7] The Court disagreed. Looking at the MTC functionally rather than focusing on its use of the label "compact," the Court explained that the MTC lacked the attributes of an "Agreement or Compact" within the meaning of the Compact Clause. Id. at 470-71, 473, 98 S.Ct. 799. The Court accordingly **711 held that the Compact Clause did not preclude states from enforcing the MTC.[8]
A second wave of litigation occurred when states that had enacted the MTC began modifying its terms. Taxpayers adversely affected by those modifications have filed a series of cases in the state courts claiming, as taxpayer does here, that the states that enacted the MTC had entered into a contract with each other and that later statutes modifying *1040 Articles III and IV violated the state and federal contract clauses.
No state court that has considered those claims has found that enacting the MTC gave rise to contractual obligations. See Graphic Packaging Corp. v. Hegar , 538 S.W.3d 89 (Tex. 2017) ; Kimberly-Clark Corp. v. Commissioner of Revenue , 880 N.W.2d 844 (Minn.), cert. den., --- U.S. ----, 137 S.Ct. 598, 196 L.Ed.2d 476 (2016) ; Gillette Co. v. Franchise Tax Bd. , 62 Cal. 4th 468, 483, 196 Cal.Rptr.3d 486, 363 P.3d 94 ; Gillette Commercial Operations v. Dep't of Treasury , 312 Mich.App. 394, 878 N.W.2d 891 (2015), appeal den. , 499 Mich. 960, 880 N.W.2d 230, 232 (2016), cert. den., --- U.S. ----, 137 S. Ct. 2157, 198 L.Ed.2d 245 (2017) ; see also Goldberg v. State Tax Comm'n , 639 S.W.2d 796 (Mo 1982) (holding that enacting the MTC did not override statutory method for apportioning income). Rather, the state courts that have reached the issue uniformly have concluded, albeit for differing reasons, that enacting the MTC gave rise only to statutory rights.
At first blush, it would appear that only the latter group of cases would bear on the state-law contract question that this case presents. Although the issue presented in the second group of cases is virtually indistinguishable from the issue presented here, the United States Supreme Court's reasoning in U.S. Steel Corp. also warrants consideration. That decision laid the groundwork for much of the analysis that followed in the later state cases, even though the two sets of issues are not identical. We accordingly begin by describing the reasoning in U.S. Steel Corp. We then discuss **712 the variations on that reasoning in the California Supreme Court's decision in Gillette and the Minnesota Supreme Court's decision in Kimberly-Clark Corporation , the leading state cases addressing whether enacting the MTC created contractual obligations. Finally, we turn to the question whether, as a matter of Oregon law, our legislature entered into a contract with other MTC states when it enacted ORS 305.655.[9]
A. Decisions from other jurisdictions
1. United States Supreme Court: U.S. Steel Corp.
In U.S. Steel Corp. , a group of multistate businesses sought to avoid application of the audit provisions in Article VIII of the MTC on the ground that the MTC was unenforceable under the Compact Clause. That clause provides: "No. State shall, without the Consent of Congress, * * * enter into any Agreement or Compact with another State." U.S. Const., Art. I, § 10, cl. 3. Because Congress has not consented to the MTC, the question before the Court was whether the MTC was an "Agreement or Compact" within the meaning of the Compact Clause. In resolving that issue, the Court started from the proposition that the MTC's use of the label "compact" was not dispositive. U.S. Steel Corp. , 434 U.S. at 470-71, 98 S.Ct. 799. What mattered was the way that the MTC functioned. Id. More specifically, the Court explained that the Compact Clause requires congressional approval only for those " 'combination[s] tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.' " Id. at 468, 98 S.Ct. 799 (quoting Virginia v. Tennessee , 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537 (1893) ).
Applying that standard, the Court explained that the MTC was not an "Agreement or Compact" subject to **713 the Compact Clause because the MTC did not authorize the states that enacted it to do anything collectively that each state could not do unilaterally. The Court reasoned:
"This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. Nor is there any delegation of sovereign power to the [Multistate Tax] Commission; each *1041 State retains complete freedom to adopt or reject the rules and regulations of the Commission. Moreover, as noted above, each State is free to withdraw at any time."
Id. at 473, 98 S.Ct. 799. Given that view of the rights and obligations created by the MTC, the Court concluded that the MTC did not encroach upon the sovereignty of the federal government and, as a result, did not require congressional approval to become effective.
Although the Court's holding in U.S. Steel Corp. is limited to the Compact Clause, its reasoning reaches more broadly. As the Court described the rights and obligations created by the MTC, they resemble a uniform law rather than a contract among the states that enact it. As the Court recognized, the MTC does not create reciprocal obligations among the member states. Rather, each state that enacts the MTC can apply Articles III and IV of the MTC regardless of whether any other state adopts the MTC. Conversely, if any state that enacted the MTC later modified its terms or repealed it entirely, those actions would have no effect on the ability of another state to apply the apportionment formulas set out in Article IV to determine the portion of a multistate business's income that is subject to taxation in that state.
Put differently, each state can apply Articles III and IV independently, as is true of a uniform law. That conclusion is hardly surprising since Articles III and IV merely implement a uniform law, UDITPA, which individual states are free to adopt, modify, or repeal independently. Moreover, as the Court explained, in enacting the MTC, states do not delegate their sovereign power to a regulatory agency in return for binding rules that apply to multiple jurisdictions. Rather, the commission created by the MTC can only recommend rules, which member states are free to adopt or reject.
**714 In short, as the Court described the MTC, it resembles a uniform law, not a binding contract.
To be sure, in U.S. Steel Corp. , the Court did not reach the question whether states that enact the MTC enter into a binding contract with each other. However, the state courts that have decided that question have agreed, for reasons that parallel the reasoning in U.S. Steel Corp. , that no contract was formed. We discuss two of those state supreme court decisions before turning to Oregon law.
2. California Supreme Court: Gillette Co. v. Franchise Tax Bd.
The question before the California Supreme Court in Gillette was virtually identical to the question presented here: whether, in enacting the MTC, California entered into a binding contract with other states that enacted the MTC. Relying on what the United States Supreme Court described as three "classic indicia" of a binding compact in Northeast Bancorp v. Board of Governors , 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed. 2d 112 (1985), the California Supreme Court explained that the MTC lacked those indicia and, as a result, created only statutory rights. Gillette , 62 Cal. 4th at 478-83, 196 Cal.Rptr.3d 486, 363 P.3d 94.[10]
The court reasoned that the "[m]ost important" indicia of a contractual obligation-reciprocal obligations among the member states-was absent:
"The Compact's provision of election between the UDITPA or any other state formula does not create an obligation of member states to each other . Even if maintenance of the election provision in one member state might benefit taxpayers in another state, that benefit to the taxpayer applies whether the taxpayer is from a member or nonmember state. This application is more akin to the adoption of a model law rather than the creation of mutual obligations among Compact members."
**715 Id. at 478-79, 196 Cal.Rptr.3d 486, 363 P.3d 94 (emphasis in original). The court also observed that the effectiveness of the MTC did not depend on the conduct of other member states. Specifically, under the MTC, a member state is free to come or go without *1042 affecting the other member states' authority to enforce the MTC's terms. Id. at 480, 363 P.3d 94, 196 Cal.Rptr.3d 486. Additionally, the court concluded that the presence of a withdrawal provision in Article X "says nothing about a member state's ability to unilaterally modify the Compact." Id. Finally, the court noted that the MTC lacked a commission or agency with regulatory authority; that is, the member states had not contracted away their regulatory authority to a multistate commission in return for binding multistate rules. Id. at 481-83, 363 P.3d 94, 196 Cal.Rptr.3d 486. Given those considerations, the court was not persuaded that the MTC created contractual obligations.
3. Minnesota Supreme Court: Kimberly-Clark Corp.
The Minnesota Supreme Court took a different tack. It started from the proposition that, under Minnesota law, a statute will give rise to contractual obligations only if it does so in "unmistakable terms." Kimberly-Clark Corp. , 880 N.W.2d at 850-51. The court concluded that the MTC lacked the sort of unmistakable wording that would demonstrate an intent to make statutory obligations contractual ones. It reasoned:
"We find no unmistakable or express promise surrendering the State's legislative authority in section 290.171 as enacted in 1983. The statute did provide that the Compact is 'enacted into law,' Minn. Stat. § 290.171 (1984), and that a member state may withdraw from the Compact 'by enacting a statute repealing the same.' Id. , art. X. But nothing in the statute dictated the 'all or nothing' position advanced by Kimberly Clark. At best, the statute is silent, but it is well established that 'neither silence nor ambiguous terms in a contract will be construed as effecting a waiver of sovereign authority' [to modify a statute's terms]."
880 N.W.2d at 851. Because the MTC did not unambiguously create contractual rights, no contract was formed, and later modifications of the MTC did not impair the business's **716 contract rights in violation of the federal Contract Clause.[11] With that background in mind, we turn to Oregon law.
B. Oregon law
This court has long held that we "treat a statute as a contractual promise only if the legislature has clearly and unmistakably expressed its intent to create a contract." Moro v. State of Oregon , 357 Or. 167, 195, 351 P.3d 1 (2015) (internal quotation marks omitted). In applying that standard, we have not required a statute to use language referring directly to contracts, promises, or guarantees. Id. at 203, 351 P.3d 1. We can infer the intent to create a contract from the text, context, and legislative history, as long as those sources, considered together, demonstrate a clear and unmistakable intent to impose contractual obligations on the state. Id. at 203 & n. 22, 207, 351 P.3d 1 ; see Hughes , 314 Or. at 21 n. 27, 25-26, 838 P.2d 1018 (concluding that, because a tax exemption was part of a larger statutory package of contractual employment benefits, the tax exemption also was contractual). With that standard in mind, we turn to the text, context, and legislative history of ORS 305.655. See Moro , 357 Or. at 205-07, 351 P.3d 1 (applying those sources to determine whether two statutory provisions were part of a larger statutory employment contract).
1. Text
Viewed functionally, the text of ORS 305.655 resembles a uniform law. As the other courts have held, Articles III and IV of ORS 305.655 do not create reciprocal rights and obligations. In enacting the MTC, Oregon did not grant a benefit to the residents of another state in return for that state granting a reciprocal benefit to residents of Oregon. See Northeast Bancorp , 472 U.S. at 164-65, 105 S.Ct. 2545 (defining reciprocal *1043 legislation that way); **717 Kane v. New Jersey , 242 U.S. 160, 167-68, 37 S.Ct. 30, 61 L.Ed. 222 (1916) (same). Rather, each state that enacts the MTC is free to apply the apportionment formulas set out in Article IV of ORS 305.655 regardless of whether any other state enacts, repeals, or modifies the MTC. Indeed, as explained above, two years before Oregon enacted the MTC, Oregon enacted UDITPA, a uniform law that initially applied the same apportionment formulas set out in Article IV of the MTC. If Oregon's enactment of UDITPA did not result in its entering into a contract with every other state that enacted UDITPA, then it is difficult to see why Articles III and IV of the MTC, viewed functionally, should lead to a different conclusion.
Not only are Articles III and IV functionally identical to a uniform law that each state may enact independently, but, as the United States Supreme Court explained, the MTC lacks a "delegation of sovereign power to the [Multistate Tax] Commission; each State retains complete freedom to adopt or reject [the Commission's proposed] rules." U.S. Steel Corp. , 434 U.S. at 473, 98 S.Ct. 799. Thus, the creation of the Commission provides no basis for saying that Oregon (or any other member state) contracted away its sovereign authority to determine tax policy to a central agency in return for binding multistate rules. Textually and functionally, the structure of Articles III, IV, and VI of ORS 305.655 is far closer to a uniform law, which each state can adopt independently and which each state remains free to modify if it chooses.
Taxpayer, however, points to other aspects of ORS 305.655, which it contends demonstrate that the legislature created contractual rights.[12] Taxpayer focuses primarily on the use of the word "compact" in ORS 305.655. Taxpayer reasons that, because a compact is a contract, the use of that term implies that the legislature intended that ORS 305.655 would create binding contractual obligations. In our view, the use of the word "compact" has less significance than taxpayer perceives.
It is certainly true that many interstate compacts are contracts. See **718 Green v. Biddle , 21 U.S. (8 Wheat.) 1, 92-93, 5 L.Ed. 547 (1823) (explaining that a compact between Virginia and Kentucky defining rights in land ceded to Kentucky was a contract). But it does not follow that all interstate compacts are agreements or compacts within the meaning of the Compact Clause, nor does it follow that every statute labeled a compact is a contract, as taxpayer asserts. As discussed above, the United States Supreme Court explained that labeling the MTC a compact did not mean that it was an "Agreement or Compact" within the meaning of the Compact Clause. U.S. Steel Corp. , 434 U.S. at 470-71, 98 S.Ct. 799. What mattered, the Court reasoned, was how the resulting combination of states functioned, not the label used to describe the combination. We are persuaded, as other state courts have been, that that reasoning applies equally to the question presented here: The MTC's use of the label "compact" is not controlling; also significant is the way the resulting combination of states functions.
The same conclusion follows from the contemporaneous use of the term "compact." At approximately the same time that the Council of State Governments was drafting the MTC in 1966, the term "compact" was being used to describe what were merely cooperative arrangements among states. Cf. David E. Engdahl, Characterization of Interstate Arrangements: When is a Compact Not a Compact? , 64 Mich. L. Rev. 63 (1965) (discussing then-current use of compacts). As Engdahl explained a year before the MTC was drafted, "[t]he most common type of 'compact' currently being concluded merely creates a study or advisory commission of representatives from each participating state," who "are instructed to recommend to their respective individual states coordinated programs of legislation designed to deal with whatever problems of conservation, health, safety, or similar matters the 'compact' may contemplate." Id. at 63; cf. Felix Frankfurter and James M. Landis, The Compact Clause of the Constitution-A Study in Interstate Adjustments , 34 Yale L.J. 685, 688-90 (1925) (discussing "new techniques and new machinery *1044 devised during recent years," including the National Conference of Commissioners on Uniform State Laws and advisory groups of state officials to recommend answers for problems that transcend state lines). That contemporaneous use of the term "compact" cuts **719 against taxpayer's argument that the use of that term in ORS 305.655 necessarily establishes that the Oregon legislature intended to create binding contractual rights and obligations when it enacted ORS 305.655.
Taxpayer argues additionally that ORS 305.655 contains procedural features that demonstrate that it creates contractual obligations. In our view, the strongest support for taxpayer's position is found in the prefatory language to ORS 305.655 and Article X. The prefatory language states that the MTC "is hereby enacted into law and entered into on behalf of this state." ORS 305.655. Article X provides that the compact goes into effect if six other states enact similar legislation. ORS 305.655, Art. X. It also provides that "[a]ny party state may withdraw from this compact by enacting a statute repealing the same." Id. Those provisions assume that a compact exists (or can exist) separately from individual legislative acts enacting and repealing it. We agree with taxpayer that those parts of ORS 305.655 support an argument that the act creates obligations beyond those ordinarily flowing from legislation.[13]
However, saying that parts of ORS 305.655 are consistent with taxpayer's claim that ORS 305.655 created contractual obligations does not mean that the text of ORS 305.655 expresses that intent clearly and unmistakably. Rather, as explained above, other parts of ORS 305.655 point in a different direction. Not only are Articles III and IV of ORS 305.655 functionally no different from a uniform law, but the absence of reciprocal legislation and a regulatory commission also cut against the conclusion that the statute imposes contractual obligations. Given those competing considerations, we cannot say that the text of Articles III and IV clearly and unmistakably creates contractual obligations, which is the standard that taxpayer must meet to convert a statute into a contract.
**720 2. Context
Taxpayer argues, however, that the context of ORS 305.655 demonstrates that the 1967 Oregon legislature intended to create contractual obligations. The context on which taxpayer relies consists primarily of the legal backdrop against which ORS 305.655 was enacted. See Figueroa v. BNSF Railway Co. , 361 Or. 142, 147, 390 P.3d 1019 (2017) (identifying existing law as context). As noted above, in 1959, the Court held that the Commerce Clause does not bar a state from taxing sales solicited by foreign companies even though those sales were exclusively in furtherance of interstate commerce. Northwestern Cement Co. , 358 U.S. at 464, 79 S.Ct. 357. In response, Congress enacted a statute that required foreign corporations to have a physical presence within a state as a predicate to taxing the corporation's in-state sales.
Congress also considered legislation that would have imposed additional restrictions on the states' ability to tax income earned by multistate businesses. As taxpayer notes, to avoid those proposed restrictions, states sought to increase uniformity in state taxation. Toward that goal, more states adopted UDITPA. By 1967, 19 of the 38 states that taxed income earned by multistate businesses had adopted all or virtually all of UDITPA. Keesling and Warren, 15 UCLA L. Rev. at 158. Additionally, by 1972, 21 of those 38 states had adopted the MTC, which incorporates UDITPA. U.S. Steel Corp. , 434 U.S. at 454, 98 S.Ct. 799.
Taxpayer infers from that context that, in adopting the MTC, states intended to enter into binding contractual obligations. However, that inference does not necessarily follow from the goal that taxpayer identifies. Rather, states could increase uniformity in taxation and thus attempt to ward off further *1045 federal legislation either by collectively adopting uniform legislation or by entering into an agreement adopting uniform legislation. Either form of legislation advances the goal of state tax uniformity, and it does not follow from the states' desire to avoid further federal legislation that states necessarily chose one form of legislation rather than the other.
To be sure, a binding contractual agreement among the states could provide a more durable guarantee than **721 collectively enacting uniform legislation, which each state would be free to repeal unilaterally at any time. However, the MTC permits member states to unilaterally withdraw from the MTC by repealing the enacting statute at any time and for any reason. It thus permits states to avoid their obligations under the MTC the same way and with the same ease that they can avoid statutory obligations. Because one form of legislation provides no more durable protection than the other, the context that taxpayer identifies does not persuade us that, in enacting ORS 305.655, the Oregon legislature intended to enter into a binding agreement with the other states that enacted the MTC as opposed to collectively enacting uniform legislation.
3. Legislative history
For the most part, the legislative history of ORS 305.655 focused on the goal that the statute was intended to serve-to forestall further congressional intervention in state taxation by making state taxes on multistate businesses more uniform. See Minutes, Joint Ways and Means Committee, H.B. 1124, Mar. 10, 1967, 92-93 (remarks of Sen. Morgan); Minutes, House Taxation Committee, H.B. 1124, Feb. 15, 1967, 1-2 (remarks of Paul Liniger). As explained above, however, identifying that goal does not establish that, in enacting ORS 305.655, the Oregon legislature intended to enter into a binding agreement as opposed to collectively enacting a uniform law. Both forms of legislation advance the goal. At times, however, the legislative history touches on how the MTC, if enacted, would function, which sheds greater light on the issue presented here. We first set out the legislative history in greater detail and then explain why that history does not establish an unmistakable intent to enter into a binding contract.
House Bill (H.B.) 1124, which was codified as ORS 305.655, was proposed by the Oregon State Tax Commission and initially considered by the House Taxation Committee. Paul Liniger, the chair of the Oregon Tax Commission, described the process of drafting the MTC and provided information about other states' consideration of the MTC. Testimony, House Taxation Committee, H.B. 1124, Feb. 15, 1967 (Tape 24). He told the committee that enacting the **722 MTC would increase uniformity among the states and help ward off further federal limitations. Id. As he put it, enacting the MTC would put Oregon "solidly on record [with] those states who are in the forefront of trying to preserve the integrity of the states and *** to prevent an onslaught of federal intervention *** [in] the field of state taxation." Id.
Liniger told the committee that the Governor's office had been apprised of the Tax Commission's efforts and was on board with the proposal. Id. However, Liniger did not say what the Governor's office had been told; that is, he did not say whether he had only told the Governor's office the goal of the legislation, as he had just told the House Taxation Committee, or whether he had instead told the Governor's office how the legislation would function. More specifically, he did not say whether he had told the Governor's office that the MTC, if enacted, would bind the state contractually or merely impose statutory obligations.
Ted de Looze, an assistant attorney general for the Oregon Tax Commission and Oregon's representative on a working group on the MTC, also spoke in support of the bill. Id. In testifying that the legislature should enact the MTC, de Looze framed the issue as whether the federal government or the states should decide state tax policy. Id. Consistently with that broad brush approach, de Looze spent much of his testimony describing two pending bills in Congress. Id. He told the committee that it was:
"necessary to know something about [the two bills] in order to know what the choice you're making between congressional action and between state action and to know *1046 that the basic choice that you're making is between a restriction by Congress on the rights of the state to tax a corporation and the [authority] of the states to give corporations uniformity of treatment so that they're not subject to different types of enforcement laws and different rules and regulations under the laws and multiplicity of taxation."
Id. He stressed that states should make their own policy choices about taxation by passing the MTC. Id.
Having framed the issue broadly, de Looze did not discuss the legal consequences if Oregon and six other **723 states enacted the MTC; that is, he did not expressly discuss whether enacting the MTC would create contractual obligations that would preclude Oregon from later modifying the MTC or merely statutory ones. One remark, however, that de Looze made before the House Taxation Committee touched on the issue. He told the committee that, although he could not guarantee that passing the MTC would forestall the pending federal legislation, he could say that,
"if the states adopt the compact and Congress gives us an enabling act , then there's less likelihood that Congress will adopt [the pending federal legislation] because the states are showing that they will take care of the [uniformity] problems that Congress itself said exist."
Id. (emphasis added). Because congressional consent is required for certain interstate compacts, it is possible to infer from de Looze's statement, "if *** Congress gives us an enabling act," that the MTC would create a compact or agreement among the states that would be effective only if Congress approved it. However, de Looze did not make that point explicitly.
The House Taxation Committee approved the bill, which then went to the Joint Ways and Means Committee. As in the House Taxation Committee, the members of the Joint Ways and Means Committee focused primarily on the reasons for enacting the bill-the threat of congressional intervention into state taxation and the possibility that more uniform state taxation would forestall federal intervention. Minutes, Joint Ways and Means Committee, H.B. 1124, Mar. 10, 1967, 92-93 (remarks of Sen. Morgan).[14] For instance, Representative Lang noted that the Council of State Governments had drafted a compact "to head off intervention by the Federal Government in this area." Id. at 92. Similarly, Senator Morgan noted that the bill was "an attempt to prevent the Federal Government from dictating what taxes states can impose on foreign corporations" and that "[a]n attempt will be made to have some uniformity by the states involved so that the corporations will know **724 what one state will do in comparison to others." Id. at 92-93. The committee also discussed the costs of funding the commission created by the bill, which Oregon would incur as long as Oregon remained a member of the Commission. Id. at 93 (remarks of Rep. McKinnis).
Beyond that, three exchanges before the Joint Ways and Means Committee arguably touch on the question presented here. The first involved a colloquy between Representative Bedingfield and de Looze:
"Representative Bedingfield asked whether anything that were done as to tax laws of Oregon would have to be ratified by the Legislature. Mr. Theodore W. de Looze, attorney for the Tax Commission, said basically the laws of the state would not be changed; that any substantive change would have to be ratified by the Legislature. Authority is delegated to the Compact to adopt uniform rules and regulations,[15 ] but the determination of who[m] Oregon would tax is a matter of substantive law determined by the Oregon Legislature. The basic purpose is to protect taxpayers from double taxation, and to *1047 protect the states from having this done by the Federal Government."
Id.
That colloquy focused on the extent to which Oregon would retain authority to determine its own tax policy, and de Looze explained that "basically the laws of the state would not be changed." The colloquy could be read either broadly for the proposition that the Oregon Legislature would retain its customary authority to enact and modify its own tax laws or narrowly for the proposition that enacting the MTC would not change Oregon's tax laws because Article IV of the MTC would duplicate UDITPA, which Oregon had enacted two years earlier. The colloquy permits either interpretation.
The second interchange occurred when Representative Bedingfield asked "what the effect would be on agreements reached by the Compact, assuming the compact has been in existence [for a number of] years, and the state **725 withdraws." Id. at 94. de Looze responded that he "did not think there would be any effect as the state probably would not change its interpretation of law, and it is always beneficial to have uniform interpretations of the laws." Id. That colloquy is something of a non sequitur . The representative's question assumes that the Compact would reach "agreements," while de Looze's answer appears to focus on interpretations of the tax laws (or perhaps interpretations of the MTC in the form of regulations proposed by the Commission) and whether those interpretations would remain in effect if Oregon were to withdraw from the compact. Ultimately, the interchange offers little insight into the question presented here. Whether ORS 305.655 created statutory obligations or contractual ones, the Commission's interpretation of either the statute or its own regulations would not bind Oregon if it were to withdraw.
The final interchange bears more directly on the issue presented here. The minutes state that, "[i]n response to Senator Newbry's question, Mr. de Looze said the Compact would have to be ratified by Congress, and a consent bill is being drafted." Id. at 93.[16] It is possible to infer from de Looze's answer that the MTC, if enacted by seven states, would be the type of agreement or compact among the states that would require congressional ratification to be effective. However, as in the House, de Looze did not state that proposition explicitly. He stated only that "the Compact would have to be ratified by Congress."
A similar discussion occurred before the Senate Taxation Committee. Liniger began by explaining the reasons for the act. He told the committee that the act would "facilitate determination of tax liability of multistate taxpayers, promote uniformity or compatibility, facilitate taxpayer convenience and compliance and avoid duplicate taxation." Minutes, Senate Taxation Committee, H.B. 1124, Mar. 21, 1967, 1. He said that three states had adopted the compact, that it "would become effective after seven state[s] adopt it. This is providing that Congress passes a consent act ." Id. (emphasis added). As we read Liniger's comments, he recognized, as de Looze had before the Joint Ways and **726 Means Committee, that, even if seven states enacted the MTC, it would become effective only if "Congress passes a consent act." Id.
Similarly, de Looze told the Senate committee that the bill "would create uniformity in taxation" and that it was "hoped that the passage of this bill by the several states would persuade Congress to pass the consent legislation." Id. When Senator Cook asked "what binding effect this legislation would have on Congress," de Looze responded that "he would get this information from the Council of State Governments." Id. Two days later, de Looze wrote a letter to the Senate committee answering Senator Cook's question. The letter stated:
"The *** question was whether, if Congress enacted a consent Act and the Multistate Tax Compact were adopted by seven or more states and were thus in operation, Congress could subsequently enact federal legislation which would be in conflict with the Compact. I have checked with the attorney for the Council of State Governments and have talked to Assistant Attorney General Timothy Malone of the Washington State Tax Commission *1048 and both agree that Congress could enact legislation at a subsequent date in conflict with the provisions of the Compact. This obtains because Congress is not party to the Compact in giving its consent, and also because the Contracts Clause in the United States Constitution is binding only on the states and not on the federal government."
Exhibit, Senate Taxation Committee, H.B. 1124, Mar. 21, 1967 (Mar. 23, 1967, letter from Theodore W. de Looze to Sen. Harry D. Boivin). In his letter, de Looze recognized that two conditions were necessary for the compact to go "in [to] operation": (1) the adoption of the MTC by seven states and (2) a "Consent Act" passed by Congress.
As noted above, for the most part, the legislative history focused primarily on the reasons for enacting the MTC, without specifying whether doing so would result in binding contractual obligations or merely uniform collective action by the states. However, a minor theme also runs through the legislative history. de Looze's testimony before the House Taxation Committee, Liniger and de Looze's testimony before the Senate Taxation Committee, and de Looze's **727 answer to Senator Newbry's question in the hearing before the Joint Ways and Means Committee all assume that, if seven states enact the MTC, an interstate compact or agreement among the states would arise. That same legislative history, however, also establishes that the witnesses and the Oregon legislature understood that the MTC was the type of interstate agreement compact that required congressional consent to become effective. That was the message from both de Looze and Liniger, as well as the general understanding at the time. See Keesling and Warren, 15 UCLA L. Rev. at 158 ("As of this writing twelve states have adopted the Compact[,] but the consent of Congress is required before the Compact can become effective.").
That understanding poses a difficulty for taxpayer's argument that the Oregon legislature intended to enter in a binding contract. If the MTC was the type of interstate compact that required congressional consent and Congress consented, then the compact's operative force would derive from federal law. See Cuyler v. Adams , 449 U.S. 433, 439 & n. 7, 101 S.Ct. 703, 66 L.Ed. 2d 641 (1981) (explaining that it had been settled since at least 1940 that "congressional consent transforms an interstate compact within this Clause into a law of the United States"). Conversely, if the MTC required congressional consent and Congress withheld its consent, then the compact or agreement would violate the Compact Clause, which provides that "[n]o State shall, without the Consent of Congress *** enter into any Agreement or Compact with another State." U.S. Const., Art. I, § 10, cl. 3. No. witness testified before the Oregon legislature that the MTC was the sort of interstate compact or agreement that did not require congressional consent and, as a result, would go into effect even if Congress refused to consent.[17]
To be sure, in 1978, 11 years after Oregon enacted the MTC, the Court held that the MTC was not the sort of interstate compact that required congressional approval to become effective. U.S. Steel Corp. , 434 U.S. at 479, 98 S.Ct. 799. However, nothing in the 1967 legislative history of ORS 305.655 **728 suggests that the Oregon legislature understood that the MTC was the sort of interstate compact that would go into effect without congressional consent; rather, all the legislative history that bears on that issue points in precisely the opposite direction. It follows that the Oregon legislature would have understood from de Looze and Liniger's testimony that, without Congress's consent, the MTC would not go into operation as an interstate compact. Without consent, ORS 305.655 would have at most the force of an ordinary statute, or so the legislature would have understood.
Considering the text, context, and legislative history of ORS 305.655, we cannot say that those sources clearly and unmistakably establish that the Oregon legislature intended to enter into a binding contract. Textually, the terms of the statute point in two directions. As discussed, the preface to *1049 ORS 305.655 and Article X contain terms that suggest that the legislature intended to enter into a compact or agreement. However, functionally, the terms of ORS 305.655 bear little resemblance to a contract. As the United States Supreme Court explained, the MTC does not permit member states to do anything collectively that each state could not do unilaterally. U.S. Steel Corp. , 434 U.S. at 473, 98 S.Ct. 799. Moreover, the context is equally consistent with the adoption of a uniform act and an interstate compact. And while there is legislative history to support the proposition that the Oregon legislature understood it was entering into an interstate compact, that history also supports the proposition that the legislature understood that the compact would require congressional approval before the compact would go "in[to] operation." In our view, those sources do not add up to a clear and unmistakable intent to enter to an agreement that would bind the states in the absence of congressional consent.
The concurrence would reach a different conclusion, although it ultimately agrees that taxpayer has no contractual right to enforce Article III. In our view, the concurrence's conclusion that, in enacting ORS 305.655, the 1967 legislature clearly and unmistakably intended to enter into a binding contract, misses the mark because it looks at only part of the picture. Textually, the concurrence focuses on the aspects of the MTC that favor its conclusion the legislature intended to enter into an agreement and concludes, **729 from that limited perspective, that the Oregon legislature clearly and unmistakably intended to bind the state contractually. However, the concurrence overlooks or summarily dismisses those terms of the MTC that demonstrate that the MTC bears little resemblance to a binding interstate agreement.
Similarly, the concurrence infers from the legislative history that the Oregon legislature intended to enter into an interstate compact, and it concludes from the context that the legislature would have been familiar with the workings of interstate compacts. However, the legislative history demonstrates that the Oregon legislature understood that the MTC was the type of interstate compact that required congressional consent to be effective. Nothing in the legislative history or the context of ORS 305.655 suggests that the Oregon legislature understood that the MTC was the sort of interstate compact that would be effective in the absence of congressional consent. If we assume, as the concurrence does, that the legislature would have been familiar with the workings of interstate compacts, then it follows that it also would have understood that, with congressional consent, the MTC would have the force of federal law. Without it, the MTC would violate the Compact Clause, leaving ORS 305.655 with at most only statutory force. We accordingly do not infer from the enactment of ORS 305.655, as the concurrence would, a clear and unmistakable intent to enter into a binding contract.[18] We accordingly agree with the Tax Court and the other state courts that have considered this issue that Articles III and IV of ORS 305.655 created only statutory obligations.
IV. STATE AND FEDERAL CONTRACT CLAUSES
Our conclusion that no contractual rights and obligations exist as a matter of state law is not necessarily the **730 end of the inquiry, at least for federal Contract Clause purposes. See General Motors Corp. , 503 U.S. at 187, 112 S.Ct. 1105 (noting that the Court retains "the duty to exercise [its] own judgment" regarding the existence of an enforceable contract obligation). In this case, however, taxpayer does not argue that the federal Contract Clause decisions lead to a different conclusion than a state-law contract analysis does; that is, taxpayer does not argue (and we see no reason to conclude) that, even if no contractual obligation exists as a matter of state law, such an obligation exists as a matter *1050 of federal constitutional law. It follows that taxpayer's state and federal contract clause claims fail.
V. ARTICLE IV, SECTION 22
Article IV, section 22, of the Oregon Constitution provides, in part:
"No. act shall ever be revised, or amended by mere reference to its title, but the act revised, or section amended shall be set forth, and published at full length."
Taxpayer contends that, when the 1993 legislature eliminated the right set out in Article III of ORS 305.655 to elect the apportionment formulas set out in Article IV of that statute, the 1993 act "revise[d] or amended" ORS 305.655 without setting out the full text of that statute, as the Oregon Constitution requires. The department responds that Article IV, section 22, applies only to acts that alter the text of an existing statute. Because the 1993 act did not alter the text of ORS 305.655 but impliedly repealed part of that statute, the department concludes that Article IV, section 22, does not apply.
Textually, Article IV, section 22, applies to acts that "revis[e] or amen[d]" an existing act. Or. Const., Art. IV, § 22. However, as this court has held for almost 125 years, Article IV, section 22, does not apply to acts that either expressly or impliedly repeal an act. Warren v. Crosby , 24 Or. 558, 34 P. 661 (1893). In Warren , the 1893 legislature passed an act that authorized counties to assess and collect property taxes that school districts, towns, and cities previously had assessed and collected. 24 Or. at 559, 34 P. 661. The final section of the 1893 act provided that " 'all laws providing for assessors **731 in, or assessments of property by, any school district, incorporated town, or city and all laws in conflict herewith, be and the same are hereby repealed.' " Id. at 560, 34 P. 661 (quoting that section).
Despite the 1893 act, the City of Astoria continued to assess and collect property taxes. When a taxpayer challenged the city's authority to do that, the city responded that the 1893 act was invalid because it had failed to comply with Article IV, section 22. In the city's view, the 1893 act violated Article IV, section 22, because the act did not set out the statutes that it repealed or superseded, including the statute incorporating the City of Astoria and authorizing it to assess and collect property taxes. 24 Or. at 559, 34 P. 661. If the city were correct, the 1893 act would have complied with the state constitution only if it had set out the complete text of each special act authorizing various cities, towns, and school districts to assess and collect property taxes.
This court was not persuaded by the city's argument. It began by identifying the evil that Article IV, section 22, was intended to remedy: acts that amended or revised an existing law by setting out only the text that was being added to or omitted from the law. Id. at 561, 34 P. 661. The court explained:
"This evil, as is well known, was the practice of amending or revising laws by additions or other alterations, which, without the presence of the original law, were usually unintelligible. Acts were passed, amending existing statutes by substituting one phrase for another, or by inserting a sentence, or by repealing a sentence, or a part of a sentence, in some portion or section thereof, which, as they stood, often conveyed no meaning, and, without examination and comparison with the original statute, failed to give notice of the changes effected. By such means an opportunity was afforded for incautions and fraudulent legislation, and endless confusion was introduced into the law. Legislators were often deceived and the public imposed upon by such modes of legislation. To prevent these consequences, and to secure a fair and intelligent exercise of the law-making power, was the object of the constitutional provision in question."
Id. The court added that an act does not present the evil that Article IV, section 22, was intended to prevent if the act **732 is "complete and perfect, and is not amendatory and revisory in its character." Id. That is true even though the act "amends by implication other legislation upon the same subject." Id.
Applying those criteria, the court explained that the 1893 act did not implicate Article IV, section 22. The act did not consist solely of a textual fragment that was being added to or omitted from an existing statute. Rather, the 1893 act was "complete" in that it expressed the legislature's policy choice to *1051 authorize counties to assess and collect certain taxes. Id. at 564, 34 P. 661. Although the 1893 act did not set out the statutes that were inconsistent with it and were, as a result, being repealed, that omission did not run afoul of Article IV, section 22. Id. ; see also Gilbertson v. Culinary Alliance , 204 Or. 326, 373-74, 282 P.2d 632 (1955) (holding that Article IV, section 22, did not apply to a labor relations act that impliedly repealed parts of an earlier act); In re Idleman's Commitment , 146 Or. 13, 21, 27 P.2d 305 (1934) (applying that principle); cf. Martin v. Gilliam County , 89 Or. 394, 173 P. 938 (1918) (holding that an act amending an earlier law by expanding the entities subject to that law without setting out its text violated Article IV, section 22 ).
The 1993 act at issue in this case is difficult to distinguish from the 1893 act at issue in Warren . In both instances, the challenged acts did not consist solely of textual fragments that were being added to or omitted from an existing statute. Rather, in both instances, the legislature either expressly or impliedly repealed part of one statute and replaced it with another. Taxpayer argues, however, that to comply with Article IV, section 22, as this court interpreted it in Warren , the 1993 act had to be "complete and perfect." In taxpayer's view, the 1993 act failed to meet that principle.
We reach a different conclusion. Before 1993, Article III of ORS 305.655 provided that a multistate business could elect to have its income apportioned using either the formulas set out in Article IV of ORS 305.655 or the apportionment formulas set out in Oregon's version of UDITPA. In 1993, the legislature provided:
"In any case in which the provisions of ORS 314.605 to 314.670 [Oregon's version of UDITPA] are inconsistent **733 with the provisions of ORS 305.655, the provisions of ORS 314.605 to 314.670 shall control."
Or. Laws 1993, ch. 726, § 20, codified as ORS 314.606 (1993).[19] The 1993 act eliminated the right in Article III of ORS 305.655 to elect the apportionment formulas in Article IV of that statute. It replaced a taxpayer's ability to elect those formulas with a requirement that a taxpayer use the apportionment formulas set out in Oregon's version of UDITPA to the extent the latter formulas differed from the former.
The legislative policy choice embodied in the 1993 act to apply the apportionment formulas in Oregon's version of UDITPA rather than the apportionment formulas in Article IV of ORS 305.655 is no different from the policy choice embodied in the 1893 act to permit counties to assess taxes that school districts, towns, and cities previously had assessed. The 1993 act reflects a "complete and perfect" legislative choice to replace one set of apportionment formulas with another in much the same way that the 1893 act reflected a "complete and perfect" legislative choice to replace one taxing entity with another. The 1893 act did not run afoul of Article IV, section 22, and neither does the 1993 act.
For the foregoing reasons, we are not persuaded that the 1993 act violated Article IV, section 22, nor are we persuaded that applying that act to determine the portion of taxpayer's income subject to tax in this state violated the state or federal contract clauses.
The judgment of the Tax Court is affirmed.
Nakamoto, J., concurred in part and concurred in the judgment in part and filed an opinion in which Flynn and Duncan, JJ., joined.
NAKAMOTO, J., concurring in part and concurring in the judgment in part.
In 1967, Oregon entered into the Multistate Tax Compact of 1966 through legislation that was codified at former ORS 305.655 (1967), repealed by Or. Laws 2013, ch. 407, § 4. Taxpayer-Health Net, Inc., and its subsidiaries-conducts interstate business in Oregon and other states. In the Tax Court, taxpayer sought a refund from the Oregon **734 Department of Revenue for excise taxes that it paid in tax years 2005 to 2007, asserting that it is entitled to use an apportionment formula in the Multistate Tax Compact as enacted in Oregon (MTC). *1052 The majority affirms the Tax Court's judgment sustaining the department's denials of taxpayer's refund claims. I write separately on taxpayer's contract clause argument because, although I agree with the majority's ultimate result, I cannot agree with the majority's keystone conclusion that Oregon did not enter into an interstate compact-a contract among states-and instead, because the Multistate Tax Compact either did not need or did not obtain congressional approval, that the 1967 Oregon Legislative Assembly intended to enact a uniform law. Health Net, Inc. v. Department of Revenue , 362 Or. 700, 726-28, 415 P.3d 1034 (2018).
The majority explains that, "[v]iewed functionally," the MTC's text resembles a uniform law. Id. at 716, 415 P.3d at 1042. With that approach, the majority omits to analyze the text in detail under the analytical framework that this court has repeatedly applied to statutes. Normally, we would look first and searchingly to text and context to determine whether, by enacting former ORS 305.655 (1967), the legislature entered into an interstate compact on behalf of Oregon. See Arken v. City of Portland , 351 Or. 113, 133, 263 P.3d 975, adh'd to on recons. sub. nom. Robinson v. Public Employees Retirement Board , 351 Or. 404, 268 P.3d 567 (2011) ("the goal is to discern what the legislature that enacted the statute in question had in mind at the time the legislature enacted the statute at issue," which is of particular importance "when analyzing statutes to determine whether they constitute a statutory contract"). This court has said many times, in different ways, that "there is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." State v. Gaines , 346 Or. 160, 171, 206 P.3d 1042 (2009) (internal quotation marks omitted); accord Arken , 351 Or. at 133, 263 P.3d 975. That analysis of text and context-along with consideration of legislative history-yields one reasonable and unmistakable conclusion: the legislature intended to enter into an interstate compact when it enacted the MTC.
**735 I am concerned that the majority's reasoning and mode of analysis will apply to other interstate compacts that the legislature has determined were proper and beneficial for Oregon. However, this case should not be viewed as an invitation for wholesale challenges to interstate compacts based on the "functionality of a uniform law" analysis, rather than a more focused analysis on the text, context, and legislative history of the compact to determine whether it provides the claimant with the particular right asserted.
As noted, I concur in the disposition-but on different grounds. Taxpayer is not a party to the Multistate Tax Compact of 1966. On appeal, taxpayer presses its refund claims based on (1) the express premise that the state was barred from enacting ORS 314.606 in 1993 because it contradicted and impaired a statutory contract provision in the MTC and (2) the implicit premise that taxpayer is a third-party beneficiary entitled to enforce the MTC's apportionment formula in Article IV, despite ORS 314.606. Taxpayer's position hinges on its contention that, as part of an interstate compact, the apportionment formula was necessarily binding on Oregon and prohibited later legislatures from effectively disabling it through adoption of ORS 314.606. Although the MTC was, and indeed remains, an interstate compact, I concur in the disposition because I conclude that taxpayer did not establish that the apportionment formula was unmistakably immutable absent complete withdrawal from the Multistate Tax Compact and that taxpayer was not an intended third-party beneficiary of the apportionment formula in former ORS 305.655 (1967). Therefore, I would affirm the Tax Court's judgment.
A. Background
During the tax years in question, Article III of the MTC provided that the taxpayer could apportion its multistate business income under the standard provided in Article IV of the MTC or another standard provided by Oregon law, at the taxpayer's election. In the tax years in question, the apportionment formula in Article IV was more advantageous to taxpayer than the formula in Oregon's uniform law concerning division of multistate business **736 income-the Uniform Division of Income for Tax Purposes Act (UDITPA), ORS 314.605 to ORS 314.675.
However, according to the terms of another statute, ORS 314.606, taxpayer was prevented *1053 from using the formula in Article IV of the MTC. In 1993, 25 years after Oregon had enacted the MTC, the Legislative Assembly enacted ORS 314.606. Or. Laws 1993, ch. 726, § 20. That statute provides that UDITPA governs if it conflicts with the MTC. In its current form, ORS 314.606 provides: "In any case in which the provisions of ORS 314.605 to 314.675 are inconsistent with the provisions of ORS 305.653 [the current codification of the MTC], the provisions of ORS 314.605 to 314.675 [UDITPA] shall control."
Thus, ORS 314.606 rendered the election option in Article III of the MTC valueless because, under the terms of the statute, the apportionment formula in Article IV cannot be used when it conflicts with UDITPA's apportionment formula. In the Tax Court, taxpayer argued that ORS 314.606 violated provisions of the state and federal constitutions by impairing a statutory contract-the MTC-and that it was entitled to use the apportionment formula in the MTC. On cross-motions for summary judgment by taxpayer and the department, the Tax Court agreed with the department that the legislature's enactment of ORS 314.606 did not violate provisions of the state and federal constitutions. Health Net, Inc. v. Dept. of Rev. , 22 OTR 128, 173, 2015 WL 5249431 (2015). In its order, the court concluded that ORS 314.606 was applicable to taxpayer based on multiple grounds-including that, due to the absence of consideration, Oregon never entered into a valid contract with other states when it enacted the MTC, id. at 142-46[1] -and that no refund was due. Id. at 173.
**737 B. In enacting the MTC, did the 1967 Legislative Assembly enter into an interstate compact?
1. The text of former ORS 305.655 (1967) establishes an interstate compact.
The text of the preamble in the MTC is itself compelling evidence that the legislature intended to enter into an interstate compact. Former ORS 305.655 introduces the Multistate Tax Compact by stating, "The Multistate Tax Compact is hereby enacted into law and entered into on behalf of this state with all other jurisdictions legally joining therein in a form substantially as follows[.]" Through that statement, the legislature unmistakably introduced what follows as an interstate compact-an agreement among states.
Beyond the fact that the legislature named the compact as such, the preamble's text further underscores that it is a compact by stating that the legislature has "entered into" the compact "on behalf of this state." Id. It is beyond dispute that a statute enacted by the Oregon Legislative Assembly is not "entered into." Rather, and commonly, a contract is "entered into." Moreover, the legislature's intention in entering into an agreement with other states that similarly enter into the compact could hardly be clearer: it declares that the compact is "entered into" "with all other jurisdictions legally joining therein in a form substantially as follows." Id. (emphasis added).
Other parts of the text of the MTC beyond the preamble unmistakably point to the legislative intention that the state enter into an interstate compact. For instance, as the majority acknowledges, Article X provides that "[t]his compact shall enter into force when enacted into law by any seven states" and shall "become effective as to any other state upon its enactment thereof." Former ORS 305.655 (1967), Art. X, § 1. Again, a model statute would not include a provision for its prospective effectiveness only if a required number of states also joined in its enactment. Nor would a model statute provide for later "withdrawal from this compact"-and specify the mode of withdrawal by repeal. But that is what Article X of the MTC further provides: a party state "may withdraw from this compact by enacting a statute repealing *1054 the same," but "[n]o withdrawal shall **738 affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal." Id. § 2. As amici curiae Interstate Commission for Juveniles and the Association of Compact Administrators of the Interstate Compact on the Placement of Children argue, the "requirement that seven states needed to enact the compact for it to become effective confirms that the states intended the reciprocity that comes from joint action as opposed to several independent actions," and "the presence of a withdrawal provision illustrates that the states intended an interstate compact because no other type of cooperative legislation contains such a provision." (Emphasis in original.)
And former ORS 305.655 (1967), Article XII, provides, among other things: "If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters." Like the text of other provisions noted, Article XII directly refers to other states that enter into the compact. There would be no need for a model statute to have to anticipate the effect of the invalidity of some aspect of one party state's enactment of the model statute and to declare the ongoing validity of the statute for all other "party states," because model statutes are just that: models. The states independently decide to what extent they will borrow from model statutes, such as those proposed by the Uniform Law Commission, perhaps best known for its Uniform Commercial Code, or by another body advocating adoption by the states. See, e.g. , Community Bank v. U.S. Bank , 276 Or. 471, 475, 555 P.2d 435 (1976) (noting that Oregon's version of the UCC did not include the definition in UCC 4-109 ); ULC Drafting Process , UNIFORM LAW COMMISSION , http://www.uniformlaws.org/Narrative.aspx?title=ULC% 20Drafting% 20Process (accessed Apr. 2, 2018) (explaining that its "Model Acts are designed to serve as guideline legislation, which states can borrow from or adapt to suit their individual needs and conditions").
In sum, it is evident from a review of the text of former ORS 305.655 (1967) that, in 1967, the legislature would have understood and intended that it was entering **739 into an interstate compact, not a uniform law, on behalf of Oregon.[2]
2. Context points to an interstate compact.
The context for interpreting a statute includes "the statutory framework within which the law was enacted," Denton and Denton , 326 Or. 236, 241, 951 P.2d 693 (1998) ; related statutes, PGE v. Bureau of Labor and Industries , 317 Or. 606, 611, 859 P.2d 1143 (1993) ; and the common law when the statute was enacted, Denton , 326 Or. at 241, 951 P.2d 693. Considering context, it is difficult to see how the words of the preamble are consistent with a mere model statute, as the majority characterizes the MTC.
First, the Oregon Legislative Assembly does not preface its independent statutes by declaring that they are "entered into" or adopted or enacted "on behalf of this state," even when they are based on a uniform law. For example, the same 1967 Legislative Assembly that enacted former ORS 305.655 (1967) also enacted the Uniform Federal Lien Registration Act. See Or. Laws 1967, ch. 445, §§ 1-7 (codified as ORS 87.806, ORS 87.811, ORS 87.816, ORS 87.821, and ORS 87.826, which have since been amended). There was no introduction or other part of that uniform law as enacted that stated that the law was "entered into" or enacted "on behalf of" Oregon. Id.
Second, the preamble's wording in the MTC echoes the wording of other compacts that the legislature had entered into before 1967. For example, the legislature enacted the Western Interstate Corrections Compact in 1959, Or. Laws 1959, ch. 290, §§ 2 to 8, and provided: "The Western Interstate Corrections *1055 Compact hereby is enacted into law and entered into on behalf of this state with all other states legally joining therein in a form substantially as follows[.]" ORS 421.284. Another example is the Interstate Library Compact enacted in 1965. See ORS 357.340 (stating **740 that the "Interstate Library Compact hereby is enacted into law and entered into by this state with all states legally joining therein in the form substantially as follows").
3. Legislative history confirms the plain meaning of the text.
If the text and context of former ORS 305.655 (1967) were alone insufficient, its legislative history supplies further, and in my view compelling, evidence for the case that the Legislative Assembly in 1967 intended to and did enter into, on behalf of Oregon, an interstate compact and not a model law.
The Legislative Assembly enacted former ORS 305.655 in 1967 as House Bill 1124. Or. Laws 1967, ch. 242, § 1. H.B. 1124 was first introduced in the House Taxation Committee on February 15, 1967. The Chairman of the State Tax Commission, Paul Liniger, introduced the bill by reading a statement expressing the tax commission's support of H.B. 1124 and describing the commission's activities preceding the bill's introduction. Minutes, House Taxation Committee, H.B. 1124, Feb. 15, 1967; Exhibit 1, House Taxation Committee, H.B. 1124, Feb. 15, 1967 (Remarks by Commissioner Liniger). Liniger's prepared remarks included informing the members of the House Taxation Committee that the tax commission had kept the Governor's office apprised of federal legislation concerning state taxation of multistate companies and the commission's efforts. He announced that "Governor McCall has recently expressed concurrence of his administration in the Commission's proposal of and support of the Tax Compact to this Legislature." Id.
An Assistant Attorney General for the tax commission, Theodore de Looze, then testified in favor of the bill and gave a detailed explanation of the MTC and its introduction in other western states as part of an effort to limit federal government action in the area of interstate commerce regulation. Minutes, House Taxation Committee, H.B. 1124, Feb. 15, 1967.
Both Liniger's testimony and de Looze's testimony established that, under the auspices of the Council of State Governments, de Looze had actively participated in **741 preparing the Multistate Tax Compact of 1966. Exhibit 1, House Taxation Committee, H.B. 1124, Feb. 15, 1967 (Remarks by Commissioner P. F. Liniger). Accordingly, various members of the committee, including then-Representative James Redden, asked de Looze questions throughout his testimony. Minutes, House Taxation Committee, H.B. 1124, Feb. 15, 1967. Among other questions legislators posed, de Looze was asked about the costs of entry into the compact. He responded that the Council of State Governments estimated total costs in the vicinity of $250,000 per year to operate the Multistate Tax Commission if seven states enacted the compact. Audio Recording, House Taxation Committee, H.B. 1124, Feb. 15, 1967, at 55.45, http://records.sos.state.or.us/ORSOSWebDrawer/RecordHtml/5667199 (accessed Mar. 30, 2018). And, de Looze explained that Article VIII of the compact provided that the commission can audit corporations and that one audit could cover multiple states and apportion the taxes due, which would be a benefit to the states and to the taxpayer. Id. at 1:11.45. Near the end of his testimony, he was asked, "This must be taken as is?" He responded, "That's right." Id. at 1:25.20. The obvious inference is that the committee members understood that the compact was not a model statute that they might enact only in part.
The bill was approved by the House Taxation Committee during its meeting on February 20, 1967. Minutes, House Taxation Committee, H.B. 1124, Feb. 20, 1967. The bill next passed to the Joint Ways and Means Committee for discussion on Mar. 10, 1967, where it was introduced by Representative Lang. Minutes, Joint Ways and Means Committee, H.B. 1124, Mar. 10, 1967.
The Joint Ways and Means Committee discussed the purpose, cost, and effect of H.B. 1124, including potential ratification of the compact by Congress through a consent bill. Id. Representative Lang explained that *1056 the bill "would make Oregon a member of the Multistate Tax Compact provided six other states also adopt it and would become effective at that time." Id. Senator Morgan explained the costs involved: "[T]he cost will probably be an additional $30,000 this biennium; if more join, costs will be divided up and there will be a smaller share for each. *** He **742 pointed out that auditing of out-of-state corporations by the Commission picked up revenue at a ratio of 100 to 1, and the audits conducted by the Compact may make up the $35,000 expenditure and more." Id. Representative Bedingfield recognized that the state could withdraw from the compact, asking "what the effect would be on agreements reached by the Compact, assuming the Compact has been in existence four years, and the state withdraws." Id. Representative Lang moved that H.B. 1124 be reported out with a "do pass" recommendation, and his motion carried unanimously. Id.
The committee also had the tax commission's written explanation of the bill. Exhibit 4, Joint Ways and Means Full Committee, H.B. 1124, Mar. 10, 1967 (Tax Commission's Explanation). The tax commission's explanation stated that the states had responded to the threat of federal legislation with a call for states to adopt existing uniform legislation, specifically the UDITPA, and with a call for preparation of a multistate compact:
"In January 1966, in response to the threat posed by the drafting of H.R. 11798, the states, as members of the National Association of Tax Administrators met at Chicago, Illinois, in executive session. The N.A.T.A adopted a resolution calling for state action in several areas. One was the adoption of legislation which would create better uniformity and equality of treatment between multistate taxpayers, such as the adoption of the Uniform Division of Income for Tax Purposes Act. This Act, which was adopted by Oregon in its 1965 legislative session, provides for the use of the so-called 'Massachusetts' or three-factor formula for the apportionment of net income through the use of property, payroll and sales. It was drafted by the National Conference of Commissioners on Uniform State Laws in 1957 and has received the approval of the American Bar Association and many other national organizations. Thirteen states have adopted this Act.
"In addition, the resolution called for the preparation [of] a multistate tax compact through which the states could effectively provide to the taxpayer uniformity of apportionment and avoidance of duplication of taxation, and ease of compliance through a simplified return for the small volume taxpayer.
**743 "The Council of State Governments, which has had vast experience in the drafting of state compacts, volunteered its services for the task of drafting such a compact."
Id. The joint committee was thus informed that an interstate compact provided a separate and different approach from a uniform law like UDITPA.
Finally H.B. 1124 arrived at the Senate Taxation Committee, where Liniger and de Looze again testified in support of the bill. Minutes, Senate Taxation Committee, H.B. 1124, Mar. 21, 1967. The Chairman of the Washington Tax Commission, George Kinnear, also presented testimony in support of H.B. 1124. He stated that Washington had already passed legislation to enact the compact and that it was extremely important for other states to adopt it to avoid federal intervention. Minutes, Senate Taxation Committee, H.B. 1124, Apr. 4, 1967.
At the hearing on March 21, 1967, de Looze was asked to answer two questions that came up concerning H.B. 1124. Exhibit 2, Senate Taxation Committee, H.B. 1124, Mar. 21, 1967 (Mar. 23, 1967, letter from Theodore W. de Looze to Sen. Harry D. Boivin). He answered those questions two days later in a letter to the chairman of the Senate Taxation Committee, Senator Harry Boivin. See id. Both the first question and de Looze's response reflect that the senators at the hearing well understood that H.B. 1124 would be entering into an interstate compact on behalf of Oregon.
As de Looze recounts, the first question he was asked was "whether, if Congress enacted a consent Act and the Multistate Tax Compact were adopted by seven or more states and were thus in operation, Congress could subsequently enact federal legislation which *1057 would be in conflict with the Compact." Exhibit 2, Senate Taxation Committee, H.B. 1124, Mar. 21, 1967 (Mar. 23, 1967, letter from Theodore W. de Looze to Sen. Harry D. Boivin). The question itself, presumably from a senator at the hearing on the bill, indicates an understanding of how the compact would come into force and, if it did, that Congress then might have to approve it. The answer from de Looze to the Senate Taxation Committee was this:
**744 "I have checked with the attorney for the Council of State Governments and have talked to Assistant Attorney General Timothy Malone of the Washington State Tax Commission and both agree that Congress could enact legislation at a subsequent date in conflict with the provisions of the Compact. This obtains because Congress is not party to the Compact in giving its consent, and also because the Contracts Clause in the United States Constitution is binding only on the states and not on the federal government.
"I am advised by the Council of State Governments, however, that at no time in the history of compacts has this occurred."
Id . (emphasis added). The emphasized portion of de Looze's answer makes it clear to the senators on the Senate Taxation Committee that the Contracts Clause in the federal constitution is "binding" on the states, and both the question and answer reflect the committee's sophistication regarding the contractual nature of a compact.[3]
He ended his letter by urging the committee to act favorably on the bill, specifically noting the benefit of the audits of businesses that Oregon could obtain:
"Four states, Washington, New Mexico, Idaho and Arkansas, have enacted the Compact. One house has passed it in Kansas, Texas and Oregon. There appears to be good reason that it will become operative. I hope your committee will act favorably, as I believe it is beneficial to Oregon audits of taxpayers."
Id .
The Senate Taxation Committee approved H.B. 1124 on April 28, 1967. Minutes, Senate Taxation Committee, Apr. 28, 1967. After approval by the legislature, H.B. 1124 was signed into law by the Governor on May 5, 1967.
**745 The text, context, and the legislative history of former ORS 305.655 (1967) illustrate the legislature's understanding and its intention. That evidence runs counter to the majority's conclusion that, because de Looze anticipated that the Multistate Tax Compact of 1966 would be submitted to Congress for its consent but Congress never provided that consent, then the legislature intended the MTC to be a run-of-the-mill statute. Health Net , 362 Or. at 726-28, 415 P.3d at 1047-49. First, that conclusion lacks any direct support in the text, context, and legislative history of the MTC. For example, there is no provision in the MTC requiring congressional consent before the compact would become effective; indeed, the text runs counter to that notion by providing that "[t]his compact shall enter into force when enacted into law by any seven states" and shall "become effective as to any other state upon its enactment thereof." Former ORS 305.655 (1967), Art. X, § 1. And, given that provision and the actual text of the MTC, it is speculative at best to think that events that occurred (or did not occur) well after the legislature enacted the MTC somehow transformed the MTC from an interstate compact into a mere statute.
The bottom line of the majority opinion is that the 1967 Legislative Assembly did not know the contractual nature of an interstate compact and the import of its enactment of the MTC. I disagree with that remarkable conclusion. I note that the department does not go as far as the majority does, even as it defends against taxpayer's refund claims: The department does not dispute that the *1058 MTC as a whole is an interstate compact, an agreement among states. Rather, the department asserts that "Oregon did not unmistakably promise other states or taxpayers that it would allow an election under Article III.1 until it repealed all of [the Compact]."
In sum, the 1967 Legislative Assembly was not confused about intending to adopt a model statute rather than its actual entry on behalf of Oregon into an interstate compact-an agreement among Oregon and the other states that entered into it. Thus, I would hold that the legislature "has clearly and unmistakably expressed its intent to create a contract." Moro v. State of Oregon , 357 Or. 167, 195, 351 P.3d 1 (2015) (internal quotation marks omitted).
**746 C. After enactment of ORS 314.606, was taxpayer entitled to use the MTC's apportionment formula in Article IV?
Taxpayer asserts, and the majority seems to agree, that the answer to the question whether the MTC is an interstate compact is determinative as to whether taxpayer is entitled to use the apportionment formula in Article IV of the MTC. I disagree. In my view, the key issue is not whether the MTC is an interstate compact, but rather is more specific: whether taxpayer, a third party, was entitled to have its taxes determined by applying Article IV's apportionment formula in the face of the legislature's enactment of ORS 314.606 directing use of the UDITPA formula.
Taxpayer contends that it is entitled, under Article III of the MTC, to choose to use the apportionment formula in Article IV of the MTC because the state Contract Clause in Article I, section 21, of the Oregon Constitution renders ORS 314.606 unenforceable.[4] Article I, section 21, provides: "No. *** law impairing the obligation of contracts shall ever be passed." Taxpayer argues that, because the Tax Court read ORS 314.606 to eliminate the Article III election, the statute necessarily violates the state Contract Clause by impairing the MTC. Viewed another way, taxpayer's argument assumes that the legislature could not enact a competing apportionment formula and require its use given the MTC's status as an interstate compact and that taxpayer-a nonparty to the compact-can enforce its provisions. Given Moro v. State of Oregon , that argument assumes too much.
One of the holdings in Moro teaches that the individual terms of the MTC must be examined to determine whether the legislature unmistakably intended any particular **747 compact term to be a contractual obligation enforceable by a taxpayer, a nonparty to the MTC. See 357 Or. at 195, 351 P.3d 1. Based on the terms of the MTC, the Oregon legislature did not "clearly and unmistakably" promise taxpayer that it would allow it an enforceable right to use the apportionment formula in Article IV until the legislature repealed the MTC.
1. Compacts in general
As one of the few works on interstate compacts succinctly explains, an interstate compact is "a formal binding contract, authorized by or enacted as legislation, between two or more states in their capacity as states." Michael L. Buenger, Jeffrey B. Litwak, Richard L. Masters, and Michael H. McCabe, The Evolving Law and Use of Interstate Compacts , xxi (American Bar Association ed., 2d ed. 2016) (hereafter Interstate Compacts ). That treatise further explains that compacts "have the status of both contract and statutory law." Id. at 3; see also Green v. Biddle , 21 U.S. (8 Wheat.) 1, 92, 5 L.Ed. 547 (1823) (holding that the 1791 Virginia-Kentucky Compact was a contract and explaining that "the terms compact and contract are synonymous").
*1059 Compacts have long-standing history in this country. As Justice Brandeis explained in Hinderlider v. La Plata Co. , 304 U.S. 92, 104, 58 S.Ct. 803, 82 L.Ed. 1202, reh'g den. , 305 U.S. 668, 59 S.Ct. 55, 83 L.Ed. 433 (1938), the use of compacts to address interstate concerns
"without a judicial or quasi-judicial determination of existing rights had been practiced in the Colonies, was practiced by the States before the adoption of the Constitution, and had been extensively practiced in the United States for nearly half a century before this Court first applied the judicial means in settling the boundary dispute in Rhode Island v. Massachusetts, [37 U.S. 657, 9 L.Ed. 1233 (1838) ]."
(Footnotes omitted.) See also Interstate Compacts §§ 1.1 & 1.2 at 4-16 (describing the historical use of compacts and their place in the American federal system).
Compacts allow states to work together to address and to shape solutions to shared policy issues. States enact compacts to "address interests and problems that do not coincide nicely either with the national boundaries or with State **748 lines-interests that may be badly served or not served at all by the ordinary channels of National or State political action." Hess v. Port Auth. Trans-Hudson Corp. , 513 U.S. 30, 40, 115 S.Ct. 394, 130 L.Ed. 2d 245 (1994) (internal quotation marks omitted). Interstate Compacts describes three broad categories of interstate compacts: (1) those that "establish and clarify state boundaries"; (2) those that "provide for states to develop and receive joint policy recommendations"; and (3) those that "establish joint legislative and regulatory policy." Interstate Compacts § 1.2.3 at 18. Among the different reasons that states may wish to enter into a compact is the desire "to avoid threats of federal intervention." Id. § 1.3 at 21. Interstate Compacts describes the Multistate Tax Compact as an example of a coordinated response of the party states to significant federal actions concerning multistate taxation. Id.
As the majority notes, some interstate compacts require approval from Congress, but some do not. The concept that not all interstate compacts require congressional consent is one of long standing. See, e.g. , Virginia v. Tennessee , 148 U.S. 503, 518, 13 S.Ct. 728, 37 L.Ed. 537 (1893). Article I, section 10, of the United States Constitution provides in part that "[n]o state shall, without the consent of Congress, * * * enter into any agreement or compact with another state." Despite that phrasing, it is well established that only compacts that affect a power delegated to the federal government or that alter the political balance within the federal system require approval from Congress. U.S. Steel Corp. v. Multistate Tax Comm'n , 434 U.S. 452, 468, 98 S.Ct. 799, 54 L.Ed. 2d 682 (1978). In U.S. Steel , the Supreme Court held that the Multistate Tax Compact of 1966 was not the kind of compact that needed congressional approval. Id. at 474, 98 S.Ct. 799.[5]
**749 2. Purpose of the MTC
Some compacts may have effects not just on the party states but also on "the population, the economy, and the physical environment in the whole of the compact area." Entergy Arkansas, Inc. v. Nebraska , 358 F.3d 528, 542 (8th Cir.), cert. dismissed sub. nom. Nebraska v. Central Interstate Low-Level Radioactive Waste Comm'n , 542 U.S. 960, 125 S.Ct. 22, 159 L.Ed. 2d 847 (2004). Under Article I of the MTC, the stated purposes of the MTC are to:
"1. Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.
"2. Promote uniformity or compatibility in significant components of tax systems.
*1060 "3. Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.
"4. Avoid duplicative taxation."
The MTC's stated purposes reflect, as taxpayer argues, that the MTC was designed to have some effect on taxpayers through "uniformity or compatibility in significant components of tax systems," but Article I does not express an intention to provide taxpayers with an immutable apportionment formula. Id. And as the legislative history of the MTC demonstrates, the legislature that enacted the MTC was also-and primarily-concerned with heading off federal legislation concerning apportionment of multistate business income. The question in this case is whether the legislature that enacted the MTC intended to preclude a later legislative choice concerning the apportionment formula that should be used in Oregon for multistate businesses. The analytical framework in Oregon to determine the answer to that question is supplied by Moro v. State of Oregon .
3. Moro v. State of Oregon
In Moro , this court held that a statute cannot be considered "as a contractual promise" unless "the legislature **750 has 'clearly and unmistakably' expressed its intent to create a contract." 357 Or. at 195, 351 P.3d 1 (quoting Campbell et al. v. Aldrich et al. , 159 Or. 208, 213-14, 79 P.2d 257 (1938) ). The court also held that the same "standard of legislative intent" applies to "whether a particular provision" of a statute is an enforceable contract term. Id. at 202, 351 P.3d 1. The court applied that standard to determine whether particular provisions of the statutory scheme pertaining to retirement benefits for members of the Public Employment Retirement System (PERS) were enforceable terms of a statutory contract that the state had entered into with the members as a result of their services as public employees, despite legislative amendments to the statutory scheme. Id. at 203-26, 351 P.3d 1. The court noted that whether a particular statutory provision was part of the contract with PERS members ultimately was a matter of legislative intent. Id. at 204, 351 P.3d 1.
Although the court in Moro was evaluating statutes that affected PERS members who claimed to be contractual parties with contract rights binding the state, the holding in Moro described above should apply equally as well to taxpayer in this case. Like the PERS members in Moro , taxpayer contends that an Oregon statute created its enforceable contractual right (in this case, it asserts, to elect and to apply the MTC's apportionment formula for purposes of its taxes), despite a later legislative enactment requiring that the UDITPA apportionment formula apply in case of any conflict between the two. Whether the 1967 Legislative Assembly did create such an enforceable contractual right should be a question of legislative intent, and taxpayer should have to meet the same "clearly and unmistakably expressed its intent" standard of legislative intent to bind future legislatures. That is due, in part, to the "canon of construction that disfavors interpreting statutes as contractual promises," Moro , 357 Or. at 195, 351 P.3d 1, that bar later-elected legislatures from responding to then-current needs or from making different policy choices.
Taxpayer's apparent answer is that by its very nature, a compact is a contract and so all the provisions of former ORS 305.655 (1967) are binding contractual terms that it may enforce. But that does not answer the precise inquiry required by Moro , namely, a review of the nature of **751 the specific contractual terms at issue and what the 1967 Legislative Assembly intended by them.
4. Articles III and IV
The department squarely addresses that precise question. First, the department correctly notes that the MTC does not expressly state one way or the other whether Oregon or other parties to the compact may unilaterally modify the apportionment formula available to multistate taxpayers through Articles III and IV. And, the department adds, the express withdrawal provision in Article X does not settle the matter by providing that a state "may withdraw from this compact by enacting a statute repealing the same." Thus, in the department's view, the 1967 Legislative Assembly did not evince an unmistakable intention to prevent future legislatures from limiting use of the apportionment formula in Article IV. In light of the overall weakness of the compact as drafted, I agree.
*1061 As amicus Council on State Taxation aptly puts it, the Multistate Tax Compact "represents a minimalist approach to corporate tax uniformity with the member states ceding only as much of their sovereignty as necessary to keep Congressional critics from interfering with state taxation." Amicus Multistate Tax Commission, the administrative body created by the compact, concurs. The commission, which under Article VI of the compact is governed by taxing agency representatives of the member states, argues that the MTC "is in the nature of an advisory compact" that created a commission with "only limited advisory powers and without any authority to bind its member states in any fashion." Amici States of Alaska, Arkansas, Hawaii, Idaho, Missouri, Montana, North Dakota, Texas, Utah, and Washington and the District of Columbia (party states) and California, Michigan, and Minnesota (former party states and current commission members), take the same position as the department and the commission.
The Multistate Tax Compact was drafted so that, from the start, party states could enact a variety of tax bases, tax rates, and apportionment schemes, but through Article III, the compact gave taxpayers the choice of the UDITPA formula or other state apportionment formulas.
**752 However, citing both federal and state case law, the department argues that the states' course of performance confirms that the party states "never intended Articles III.1 and IV to bind a state until that state withdrew from the entire compact." Like the department, the commission argues that the compact "includes no explicit prohibition against or penalty for unilaterally altering, amending or repealing any apportionment provision" and further contends that member states have "no obligation to interpret or apply" the apportionment provisions "in the same way as any other state."
Under Oregon law, a lengthy course of performance under a contract can be used to discern the intention of the parties. In Tarlow v. Arntson , 264 Or. 294, 300-01, 505 P.2d 338 (1973), for example, this court considered an unclear 1927 agreement concerning the use of an elevator to determine whether that agreement granted a license to use the elevator terminable upon notice or whether the parties intended the right of use to be akin to a right that ran with the land. This court stated that "[h]ow the original parties and their successors conducted themselves in relation to the agreement is instructive * * * of what must have been intended." Id. at 300, 505 P.2d 338. In Yogman v. Parrott , 325 Or. 358, 364, 937 P.2d 1019 (1997), in construing an ambiguous contract, this court explained that "the parties' practical construction of an agreement may hint at their intention." See also Tarrant Regional Water Dist. v. Herrmann , 569 U.S. 614, 636, 133 S.Ct. 2120, 186 L.Ed. 2d 153 (2013) (the parties' " 'course of performance under the Compact is highly significant' evidence of [their] understanding of the compact's terms" (quoting Alabama v. North Carolina , 560 U.S. 330, 346, 130 S.Ct. 2295, 176 L.Ed. 2d 1070 (2010) ) ).
In accordance with their view of Articles III and IV, the department and various amici aligned with the department describe a course of performance by member states over a period of close to half a century that indicates that the party states did not consider the apportionment formula in Article IV to be immutable. Starting with Florida in 1971, see 1971 Fla. Laws, 51-52 (Special Session) (deleting Articles III and IV and adopting a two-factored apportionment formula), the member states have allowed each other to eliminate or override Articles III and IV while continuing as full **753 compact members. The department notes that between 1987 and 2009, six member states in addition to Oregon adopted laws that eliminated, disabled, or superseded Article III.[6] In 2011, Alabama amended the formula in Article IV. See Ala. Code § 40-27-1 (2011). As Oregon did in 2013, Utah and the District of Columbia have withdrawn from the Multistate Tax Compact and then enacted it anew without Articles III or IV. See 2013 Utah Laws 2699, 2700; D.C. Law 20-61, § 73421(a), (b), 60 DCR 12472. And in 2015, North Dakota "amended and reenacted" the compact by deleting Articles III and IV and renumbering remaining provisions. See 2015 N.D. Laws 1630, 1632-36.
In view of the silence of the compact concerning amendment or overriding of Articles *1062 III and IV, the weakness of the compact as drafted, and the parties' course of performance, I would hold that the legislature's enactment of ORS 314.606 did not impair a contractual obligation Oregon had to taxpayer under the MTC.
5. Taxpayer is not an intended third-party beneficiary entitled to use the apportionment formula.
In addition to the problem taxpayer has with showing unmistakable legislative intent to create a binding obligation to provide taxpayer with the apportionment formula in Article IV, taxpayer's position does not account for its status as a nonparty to the MTC. I would hold that whether the apportionment formula in Article IV creates a contractual right enforceable by taxpayer, as opposed to a party state, remains a question of legislative intent. See Multistate Tax Comm'n v. Merck & Co., Inc. , 289 Or. 717, 722-23, 617 P.2d 1371 (1980) (raising the question but assuming that taxpayer, rather than a member state, could complain of purportedly improper vote that had authorized an audit of taxpayer); see also Doe v. Pennsylvania Bd. of Probation and Parole , 513 F.3d 95, 106-07 (3d Cir. 2008) (examining terms of compact to determine whether the plaintiff, who sought to transfer his probationary supervision from New Jersey to Pennsylvania, both signatories to the Interstate Compact **754 Concerning Parole and Probation, was an intended third-party beneficiary).
According to the department, taxpayer, a member of the public, is only an incidental beneficiary of the MTC and is not entitled to enforce Articles III and IV after the enactment of ORS 314.606. The department and amici offer a variety of arguments supporting that position. In its reply brief, taxpayer asserts that it is an intended third-party beneficiary of Articles III and IV.
This court has relied on Restatement (Second) of Contracts , section 302 (1981), for the rule concerning who qualifies as an intended beneficiary of a promise. See Hale v. Groce , 304 Or. 281, 286, 744 P.2d 1289 (1987). Section 302 provides:
"Intended and Incidental Beneficiaries
"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
"(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
"(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."
As used in section 302, a "promisee" is the person to whom a promise is addressed. Restatement (Second) of Contracts § 2(3). In the context of the MTC, the promisee and the promisor are member states of the compact. To establish that taxpayer is an intended beneficiary, taxpayer must establish that "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties," i.e. , the member states, and that either of the two circumstances delineated in subsections (1)(a) and (1)(b) exist. Restatement (Second) of Contracts § 302(1).
**755 Even assuming that it might be appropriate to recognize a right of performance in taxpayer, taxpayer cannot establish the second element necessary for status as an intended third-party beneficiary. First, taxpayer is plainly not a creditor of a promisee, as provided in section 302(1)(a). Second, the circumstances do not indicate that the other member states intended to give taxpayer the "benefit of the promised performance," as provided in section 302(1)(b). In this case, the "benefit of the promised performance" is ultimately an irrevocable right to use the apportionment formula in Article IV. Taxpayer asserted a right to use that formula more than a decade after the Oregon legislature enacted ORS 314.606 and demonstrated that Oregon did not intend to allow taxpayers to use the formula. For the reasons noted above with respect to the effect of ORS 314.606, it is difficult to conclude that the promisees-the other member states-nevertheless intended to give Oregon taxpayers the benefit of the election in Article III and, ultimately, the apportionment formula in Article IV.
Accordingly, taxpayer is an incidental beneficiary. See Restatement § 302(2). As comment *1063 e to section 302 explains: "Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created." Under Oregon law, incidental beneficiaries are not entitled to enforce contractual promises. Sisters of St. Joseph v. Russell , 318 Or. 370, 375, 867 P.2d 1377 (1994). I would hold that taxpayer is not an intended beneficiary of Articles III and IV of the MTC, despite their placement in an interstate compact, and is not entitled to use the apportionment formula in Article IV of the MTC in light of the later enactment of ORS 314.606.
6. Decisions by other state supreme courts
Only three other state supreme courts have addressed the issue of the apportionment formula in Article IV, and two of them have decided the issue employing a similar analysis. The most recent decision by a high court of a member state concerning the apportionment formula in the Multistate Tax Compact is Graphic Packaging Corp. v. Hegar , 538 S.W.3d 89, 61 Tex. Sup. Ct. J. 212 (Tex. 2017). In that **756 case, the Texas Supreme Court assumed, without deciding, that the state's franchise tax was an income tax within the compact's meaning, 538 S.W.3d at 96, and addressed two resulting issues: (1) whether the franchise tax statute providing for exclusive application of the single-factor apportionment formula, rather than the compact's three-factor formula in Article IV, applied to the taxpayer's multistate business revenue and (2) whether the compact prevented the Texas legislature from requiring the taxpayer to use the separate apportionment formula. Applying principles of statutory construction, the court first held that the tax statute, which "by its terms, precludes the taxpayer from using the Compact's three-factor formula," provided "the exclusive formula for apportioning the franchise tax." Id. at 99. The court then addressed the second issue, which this court confronts in this case, too.
The Texas Supreme Court did not conclude that Texas had not entered into an interstate compact. Rather, the court reviewed the terms of the compact, which it concluded were not like terms of a "binding regulatory compact." Id. at 101. The court determined that (1) the Texas legislature had not unmistakably evinced its intention to bind future legislatures and to prohibit them from overriding the compact's apportionment formula in Article IV, id. at 104-05, and (2) the taxpayer was not unmistakably made a contractual third-party beneficiary of the compact's election provision in Article III, id. at 105. The court was persuaded that "the member states did not intend for Articles III.1 and IV to be immutable, binding contractual terms" and concluded that the legislature had acted within its authority in enacting the franchise tax statute providing the exclusive method of apportionment and that the statute did "not violate the Contract Clause or otherwise undermine the Compact's purpose or efficacy." Id. at 106-07.
Nor does Kimberly-Clark Corp. v. Comm'r of Revenue , 880 N.W.2d 844 (Minn. 2016), cert. den. , --- U.S. ----, 137 S.Ct. 598, 196 L.Ed. 2d 476 (2016), support the majority's "uniform law versus interstate compact" analysis. Like the taxpayer here, the Kimberly-Clark taxpayers asserted a right to use the apportionment formula in Article IV of Minnesota's version of the Multistate Tax Compact, well **757 after its repeal (along with Article III) in 1987. 880 N.W.2d at 845. On review, the Minnesota Supreme Court declined to decide whether the compact was "an advisory model law," as urged by the defendant, and decided the case instead based on "whether the Legislature's enactment of the Compact-specifically Articles III and IV-created a contractual obligation that prohibited the Legislature from later repealing Articles III and IV *** without withdrawing completely from the Compact." Id. at 848-49. The court concluded that, given the unmistakability doctrine, the legislature had not created a binding contractual obligation to continued allowance of the apportionment formula in Article IV, and that even had it appeared to do so, such an obligation would be invalid under the Minnesota Constitution. Id. at 849-50.[7] *1064 In short, the majority incorrectly fails to acknowledge that the MTC is an interstate compact. However, the Contract Clause in Article I, section 21, of the Oregon Constitution did not render ORS 314.606 unenforceable, and taxpayer was not entitled to use Article IV's apportionment formula. Thus, I concur that the judgment of the Tax Court should be affirmed.
Flynn and Duncan, JJ., join in this concurring opinion.

The legislature repealed ORS 305.655 in 2013. Or. Laws 2013, ch. 407, § 4. It replaced that statute with ORS 305.653, which omits two articles found in ORS 305.655. See Or. Laws 2013, ch. 407, § 2 (omitting Articles III and IV). ORS 305.655 was in effect at all times material to this case, and we refer to it throughout the rest of the opinion without designating it each time as former ORS 305.655 (1967).

Under the terms of the MTC, the commission may make "specific recommendations of the amounts to be appropriated" by each of the member states. Art. VI, § 4(b). However, the MTC does not expressly require member states to pay those recommended amounts. Rather, it provides only that the commission "may accept any and all donations and grants of money, equipment, supplies, materials and services, conditional or otherwise, from any governmental entity." Id. § 1(i) (emphasis added).

We refer to the ORS 314.605 to 314.675, the statutes adopting UDITPA, as Oregon's version of UDITPA. We refer to Article IV of ORS 305.655, which incorporated part of UDITPA, as Article IV of ORS 305.655 or Article IV of the MTC.

As discussed above, initially Oregon's version of UDITPA and Article IV of ORS 305.655 provided that a business's multistate income would be apportioned using three equally weighted factors: the sales factor, the property factor, and the payroll factor. Increasing the weight given the sales factor permitted Oregon to tax a greater share of a multistate business's income to the extent that the business's sales in Oregon were proportionately greater than its payroll and property here.

For the purposes of this opinion, we assume, without deciding, that taxpayer is a third-party beneficiary of any contract formed among the states.

Timing potentially is an issue. If the 1993 act is viewed as an anticipatory breach, then taxpayer's 2010 and 2011 refund claims, which are at their heart breach-of-contract claims, could be subject to a laches defense. Taxpayer's claims, however, appear to rest on the proposition that the breach occurred in 2010 and 2011 when the department disregarded taxpayer's election under Article III to have the apportionment formulas in Article IV used to determine its taxable income. Because the department does not contend otherwise, we assume, for the purposes of this case, that any breach occurred when taxpayer filed refund claims in 2010 and 2011 and, in doing so, sought to elect the apportionment formulas in Article IV.

The Compact Clause provides: "No. State shall, without the Consent of Congress, *** enter into any Agreement or Compact with another State." U.S. Const., Art. I, § 10, cl. 3.

The question in U.S. Steel Corp. was whether the Compact Clause precluded states from enforcing the MTC. Having concluded that it did not, the Court did not decide (and presumably would not have decided) the subsidiary state-law question whether the obligations created by enacting the MTC were contractual or merely statutory.

Taxpayer's argument that states that enact the MTC enter into a contract with each other could present an interesting choice-of-law issue to the extent that the potentially applicable state laws regarding contract formation differ. The Tax Court applied Oregon law to decide whether enacting ORS 305.655 gave rise to contractual obligations, and the department urges us to do so too. Taxpayer has not argued that Oregon law does not apply, nor has it contended that principles of contract formation employed by other states that have enacted the MTC differ from Oregon's. In the absence of an argument to the contrary, we apply Oregon law to decide whether ORS 305.655 gave rise to contractual obligations.

The three indicia of a binding compact that the Court identified in Northeast Bancorp parallel the aspects of the MTC that persuaded the Court in U.S. Steel Corp. that the MTC was not an agreement or compact within the meaning of the Compact Clause.

The Michigan Court of Appeals employed both lines of analysis. Gillette Commercial Operations , 878 N.W.2d at 903-06. It held, as the Minnesota Supreme Court did, that the terms of the MTC did not reflect an unmistakable intent to create contractual obligations and, for that reason, created only statutory obligations. Id. at 903-04. It then considered the three indicia that the California Supreme Court discussed in Gillette and concluded that the absence of those indicia demonstrated that, in adopting the MTC, the Michigan legislature had not created binding contractual obligations. Id. at 904-06. The Texas Supreme Court recently followed the same course. See Graphic Packaging Corp. , 538 S.W.3d at 101-06 (employing both lines of analysis).

In arguing that ORS 305.655 created contractual rights, taxpayer does not rely on Article IX, which is not in effect. Accordingly, we do not consider that article.

Taxpayer also argues that, under Article X, once states enact the MTC, they are bound by its terms unless and until they repeal it. Taxpayer's argument assumes its conclusion. That is, taxpayer's argument assumes that, because the MTC is a contract, states are required to abide by it until they repeal it in accordance with its terms. However, taxpayer's conclusion is true only if its premise is. In our view, the most that can be said about that part of Article X is that it is ambiguous, a conclusion that does not cut in taxpayer's favor. See Kimberly-Clark Corp. , 880 N.W.2d at 851 (reaching that conclusion).

Because no tape recordings of the hearings before the Joint Ways and Means Committee or the Senate Taxation Committee are available, the minutes are the only available record of those hearings.

Under the MTC, the Commission, not the Compact, has authority to adopt uniform rules and regulations, which member states are free to accept or reject. We assume that de Looze referred generically to the "Compact" rather than referring more specifically (and correctly) to the Commission.

The minutes do not disclose what Senator Newbry asked.

As noted, Congress never consented. See U.S. Steel Corp. , 434 U.S. at 458 n. 8, 98 S.Ct. 799 (listing multiple instances in which "[c]ongressional consent has been sought but never obtained").

The amici debate whether the MTC differs from other interstate compacts. The Multistate Tax Commission has filed an amicus brief in this court in support of the department in which it explains that the MTC lacks features that characterize other interstate compacts. It notes that other compacts grant reciprocal rights to citizens of member states, condition a state's ability to repeal the enacting statute, or cede regulatory authority to a regulatory commission. We agree that the terms and circumstances of the MTC are unique, with the result that our holding in this case is limited to what can only be described as an atypical law.

In 2013, the legislature amended ORS 314.606 to change the reference to ORS 305.655 to ORS 305.653. Or. Laws 2013, ch. 407, § 3.

I also would disapprove the Tax Court's reasoning based on a failure of consideration for the compact, which in my view is factually and legally incorrect. In brief, the court did not consider Oregon's obligation to fund the Multistate Tax Commission and the mutual promises of the states entering into the compact before concluding that there was no consideration. The Tax Court's ruling appears to be the only time a court has concluded that a compact was without consideration. Michael L. Buenger, Jeffrey B. Litwak, Richard L. Masters, and Michael H. McCabe, The Evolving Law and Use of Interstate Compacts , xxi (American Bar Association ed., 2d ed. 2016).

In fact, as the majority notes, the legislature had already adopted UDITPA in 1965, the biennium immediately before the legislature entered into the MTC. Health Net , 362 Or. at 706, 415 P.3d at 1037. It makes little sense that the legislature would enact yet another uniform law with the same apportionment formula in 1967; rather, it is reasonable to conclude that the legislature intended to accomplish something else.

The second question was "whether or not under Article VIII of the Compact, titled 'Interstate Audits,' the State of Washington, for example, could request the Compact Commission to make an audit of the books and records of Oregon businessmen to ascertain whether Washington residents had purchased goods in Oregon and were subject to Washington sales taxes." Exhibit 2, Senate Taxation Committee, H.B. 1124, Mar. 21, 1967 (Mar. 23, 1967, letter from Theodore W. de Looze to Sen. Harry D. Boivin).

Taxpayer similarly argues that the Contract Clause in the United States Constitution barring impairment of contracts, Article I, section 10, clause 1, rendered ORS 314.606 unenforceable: the federal Contract Clause protection against impairment extends to a state's promissory obligations within any interstate compact. But whether a state statute creates contractual rights depends, in general, on whether it evinces "a legislative intent to create private rights of a contractual nature enforceable against the State." United States Trust Co. of New York v. New Jersey , 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 52 L.Ed. 2d 92, reh'g den. , 431 U.S. 975, 97 S.Ct. 2942, 53 L.Ed. 2d 1073 (1977). In this case, I would reject taxpayer's federal Contract Clause argument given the conclusions I draw concerning taxpayer's parallel state Contract Clause argument.

The majority gives U.S. Steel significance in its analysis of whether the party states entered into an interstate compact and, more particularly, whether Oregon, as a party state, entered into an interstate compact through the MTC. I submit that the Supreme Court's discussion of the Multistate Tax Compact of 1966 in U.S. Steel on the different issue of the compact's effect on federal powers is not helpful to the analysis this court must conduct to determine whether the Oregon Legislative Assembly of 1967 knew what it was doing when it enacted former ORS 305.655 (1967) and intended to enter into an interstate compact. Rather, the Court's discussion could have relevance to the nature of the provisions that the compact contains.

See 1987 Minn. Laws 1039, 1098-1119; 1993 Cal. Stat. 5441; 1994 Idaho Sess. Laws 948; 1995 Ark. Acts 682; 1981 Tex. Gen. Laws 1528, 1529-1533; 2008 Colo. Sess. Laws 953.

The California Supreme Court has also ruled on this issue, but took a different tack, like the one the majority follows in this case. See Gillette Co. v. Franchise Tax Bd. , 62 Cal. 4th 468, 477, 196 Cal.Rptr.3d 486, 363 P.3d 94, 99 (2015), cert. den. , --- U.S. ----, 137 S.Ct. 294, 196 L.Ed.2d 238 (2016) (holding that the Multistate Tax Compact is not a binding contract among member states).